

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-11-2001

# Bohler Uddeholm Amer v. Ellwood Grp Inc

Precedential or Non-Precedential:

Docket 99-3773

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Bohler Uddeholm Amer v. Ellwood Grp Inc" (2001). *2001 Decisions.* Paper 74.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/74

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 11, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3773

BOHLER-UDDEHOLM AMERICA, INC., a Delaware
Corporation; BOHLER-UDDEHOLM COPORATION, a
New York Corporation

v.

ELLWOOD GROUP, INC., a Pennsylvania Corporation;
ELLWOOD QUALITY STEELS COMPANY, a Pennsylvania
Business Trust; ELLWOOD SPECIALTY STEEL COMPANY,
a Pennsylvania Corporation; DAVID E. BARENSFELD,
an individual

v.

BOHLER-UDDEHOLM COPORATION, a New York
Corporation; UDDEHOLM LIMITED,
a Canadian Corporation

Ellwood Group, Inc.; Ellwood Quality Steels Co.;
Ellwood Specialty Steel Co.; David Barensfeld;
Bjorn E. Gabrielsson, Appellants

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. Nos. 91-cv-00706 and 96-cv-00734)
District Judge: Honorable Robert J. Cindrich

Argued: July 19, 2000

Before: BECKER, Chief Judge, SLOVITER and
NYGAARD, Circuit Judges.

(Filed: April 11, 2001)

H. WOODRUFF TURNER, ESQUIRE
 (ARGUED)
ROBERT B. SOMMER, ESQUIRE
DAVID M. ACETO, ESQUIRE
DOUGLAS A. PEARSON, ESQUIRE
Kirkpatrick & Lockhart, LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312

Counsel for Appellants

VINCENT J. CONNELLY, ESQUIRE
ALAN J. MARTIN, ESQUIRE
 (ARGUED)
DANIEL L. RING, ESQUIRE
ERIC S. DREIBAND, ESQUIRE
TERRI HOSKINS, ESQUIRE
AUDREY FRIED-GRUSHCOW,
 ESQUIRE
Mayer, Brown & Platt
190 South La Salle Street
Chicago, IL 60603

WILLIAM M. WYCOFF, ESQUIRE
Thorp, Reed & Armstrong
One Riverfront Center
Pittsburgh, PA 15222

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal by defendant Ellwood Group, Inc., (Ellwood) from a final judgment enter ed against it by the District Court for the Western District of Pennsylvania in favor of plaintiff Uddeholm Tooling AB (Uddeholm). This complicated commercial case emerges fr om the disintegration of a joint venture enter ed into by Ellwood, a Pennsylvania corporation in the business of for ging steel ingots into various components of heavy machinery, and

Uddeholm, a Swedish company that produces specialty tool steels. Uddeholm brought numerous claims against Ellwood, including breach of contract, br each of fiduciary duty, misappropriation of trade secrets, and civil conspiracy. Resolution of this appeal requir es us to address a number of questions of Pennsylvania contract, business tort, and damages law, along with two questions on the application of the Federal Rules of Evidence.

The most important issue involves the question whether the joint venture agreement was ambiguous as a matter of law as to whether Ellwood could properly claim rebates for its sales to third parties of ingots pr oduced by the Ellwood–Uddeholm Steel Company (EUS), the entity for med by the joint venture, or whether Ellwood was limited to rebates for sales by EUS to Ellwood for Ellwood's own use. Uddeholm maintains that the latter interpretation r eflects not only the clear intent of the contracting parties but also the raison d'etre of the contract. We conclude that the District Court was correct in finding a contractual ambiguity. We also conclude, however, that it erred in instructing the jury that Ellwood had the burden of establishing the meaning of the disputed terms in the agreement because of the fiduciary relationship between the parties that was cr eated by the joint venture. We must therefor e vacate the jury verdict on the contract claim and remand for a new trial.

Other important issues include: (1) whether Uddeholm's breach of fiduciary duty and misappropriation of trade secrets claims were covered and thus precluded by its breach of contract claim; (2) whether Ellwood's potential liability on the civil conspiracy claim was for eclosed because the jury found no other conspirator; (3) whether Uddeholm could recover on its contract claim for rebates Ellwood received in 1991; (4) the inter est rate to be applied to sums Uddeholm owed Ellwood for post–ventur e purchases of steel; and (5) two evidentiary questions: the admissibility of a document under Fed. R. Evid. 807 (the residual exception to the hearsay rule), and whether the court erred by requiring redaction of an Uddeholm employee's memo before admitting it into evidence.

We will affirm the District Court's decision allowing Uddeholm to recover on its fiduciary duty claims, for the

3

wrongful behavior that underlies this claim was not covered by the joint venture agreement. However, we will set aside both the verdict for Uddeholm on the misappropriation claim (because it was covered by the joint venture agreement) and the verdict on the civil conspiracy claim (as there was insufficient evidence of the existence of a second co-conspirator, which is required under Pennsylvania law). With respect to the latter issue, we reject Uddeholm's contention that Ellwood did not validly preserve its objection. We will also set aside the District Court's order that applied a 6% interest rate to the sums Uddeholm owed Ellwood for steel that it bought post-venture, and remand for further findings of fact on this issue. We will affirm the District Court's evidentiary rulings, because its application of Rule 807 and its redaction of the employee's memo were not abuses of the court's discretion. We therefore will affirm in part, reverse in part, and remand for further proceedings.

I. Facts and Procedural History

Prior to 1984, Ellwood relied on outside manufacturers to supply it with steel ingots for its steel-forging business. In early 1984, Ellwood decided to construct an ingot mill in Ellwood City, PA, in order to produce its own supply of steel, which it did under the name Ellwood City Forge Steel Company (ECF). At around this time, Uddeholm decided that it wanted to set up a manufacturing plant in the United States in order to avoid quotas on imports of tool steel from Sweden, deliver steel more quickly, and avoid currency fluctuations. The two companies entered negotiations with an eye towards forming a joint venture in which Uddeholm would provide its steelmaking expertise and some funding for Ellwood's new mill, while Ellwood would provide Uddeholm with a U.S. source of tool steel as well as most of the financing of the mill.

After nine months of negotiation, the two companies entered into a joint venture agreement which comprised several contracts executed in April and June 1985 (collectively, the Agreement).1 For the purposes of this

_____

1. More specifically, the joint venture agreement was between Uddeholm and Ellwood City Forge Corporation, a subsidiary of the Ellwood Group.

4

appeal, the most important of these contracts ar e the Shareholders Agreement, the two Steel Pur chase Agreements (one each for Ellwood and Uddeholm, covering their purchases from the new mill), and the Know-How License Agreement. Under the terms of the Agreement, Ellwood became an 80% shareholder and Uddeholm a 20% shareholder in ECF, which changed its name to the Ellwood-Uddeholm Steel Company (EUS). As it had with ECF, Ellwood continued to run the daily operations of EUS. The Agreement provided that EUS would sell steel ingots to Uddeholm and Ellwood at cost plus a percentage of this cost to cover overhead, which was set in the original contracts at 35%. "Overhead" is defined in the Agreement as including "all interest, depreciation, selling, general and administrative costs and all other costs and expenses which are not included as part of the `base costs' [of the ingots]." Uddeholm had the right to pur chase up to 10% of the ingots produced by EUS, and Ellwood had the right to purchase the rest.

The Agreement included the rebate pr ovision (S 2.3 of the two Steel Purchase Agreements contained within the overall Agreement) that is central to the current dispute. This clause provided for "rebates" in case one of the partners paid more than its allotted share of EUS's overhead, which was based on each partner's percentage contr ol of EUS: 80% for Ellwood, 20% for Uddeholm. More specifically, if the amount of Ellwood's steel purchases that went to EUS's overhead (i.e., the 35% over the ingot cost) exceeded 80% of the total sums that went to overhead during the calendar year, then Ellwood was entitled to a r ebate of the amount it paid in excess of this 80%. The same held true for Uddeholm, but at 20%. The Agreement also pr ovided that if either partner's contributions to EUS's over head totaled less than its percentage control of the company (i.e., if Ellwood's contributions were less than 80% of EUS's overhead, or Uddeholm's contributions wer e less than 20%), that partner had to make payments to EUS in or der

_____

After the joint venture began, Uddeholm changed its name to the Bohler-Uddeholm Corporation, but for simplicity we will use the name "Uddeholm" to refer to that corporation in this opinion.

to bring its share of the overhead paid to the level equivalent to their percentage control. This system was designed to ensure that Ellwood always paid exactly 80% of EUS's overhead, and Uddeholm paid for exactly 20%, no matter how much steel each was buying from EUS.

As part of the Agreement, the parties established that after October 1, 1989, either party could cause EUS to buy Uddeholm's 20% stake in EUS at book value (thus making Ellwood the sole owner of EUS). The Agreement contained non-compete provisions that went into ef fect if this purchase option was exercised; the Agr eement granted EUS an exclusive license for Uddeholm's "know-how," but prohibited EUS from using such know-how for three years after the end of the joint venture.

The documents comprising the Agreement included the Business Plan for EUS, which was incorporated by reference into the Shareholders Agr eement. The Business Plan stated that "[t]he principal purpose of EUS will be to supply high quality ingot to its owners, Ellwood City Forge Corporation and Uddeholm Tooling AB," and that "[i]ngots shall be cast in a variety of shapes and weights according to the requirements of Ellwood City For ge Corporation and Uddeholm Tooling AB." During the negotiations for the Agreement, Ellwood proposed a draft Business Plan which indicated that Ellwood desired to sell EUS's ingots to third-party purchasers in the general market. Ellwood's proposed Business Plan included the additional purpose for EUS that "[s]econdarily, [EUS] shall be operated with the purpose of earning the maximum possible profit fr om sale of its product to third parties." The pr oposal added that ingots shall be cast to the requirements of "third party purchasers" as well as Ellwood and Uddeholm, and that "[i]ngots may be sold to third parties to the extent permitted under the various contracts among EUS, Ellwood City Forge and Uddeholm Tooling."

Uddeholm rejected these proposed alterations to the Business Plan, making clear to Ellwood that it did not want EUS's production to go to anyone but the shar eholders. Ellwood agreed to delete from the Business Plan all language to the effect that the secondary purpose of EUS was to sell tool steel to third parties, though there is

6

evidence in the record that the parties came to an understanding that perhaps marginal amounts of ingots would be sold by the shareholders to thir d parties if EUS's financial circumstances so requir ed.

The EUS plant commenced operation in 1985. It is disputed whether EUS and Ellwood provided Uddeholm with full disclosure in EUS's monthly and yearly financial statements during the term of the joint ventur e. Uddeholm claims that it requested full information and did not receive it, while Ellwood contends that it always pr ovided full information. It is undisputed, however , that during the venture EUS sold a substantial amount of steel ingots that ended up going to third parties in unchanged form, i.e., not as forged steel products but as raw steel ingots. The proper characterization of these sales to third parties is the subject of strong disagreement between Ellwood and Uddeholm. Ellwood asserts that it bought the ingots fr om EUS and resold them to the third parties, so that it properly received a rebate on all these "purchases," as that term is defined in S 2.3 of the Steel Purchase Agreements. Uddeholm counters that the ingots were essentially sold dir ectly by EUS to the third parties at Ellwood's direction, and that Ellwood was not entitled to rebates on these sales because they were not "purchases" as defined in S 2.3 of the Steel Purchase Agreements.

In 1987, Uddeholm designated its employee Bertil Rydstad to be the person responsible for Uddeholm's relationship with Ellwood and EUS. In Mar ch 1988, Rydstad wrote a memo that is a subject of dispute in this appeal. In that memo, Rydstad stated that he understood that Ellwood was free to resell the ingots bought from EUS: "Thus, there are only two purchasers of ingots. However, nothing precluded [sic] them from selling to a third party." At trial, the District Court ordered this language redacted from the memo before the memo was admitted into evidence because these statements involved a "legal interpretation by a non-legal person," and because the statements did not address the relevant issue of interpretation of the Agreement, namely, whether Ellwood was entitled to receive rebates for its ingot sales to third parties.

7

On January 29, 1991, Ellwood notified Uddeholm of Ellwood's intention to exercise its right under the Agreement to have EUS buy Uddeholm's EUS shar es at their December 31, 1990, book value. In March 1991, Deloitte & Touche prepared a r eport for EUS detailing EUS's book value as of December 31, 1990. Uddeholm objected to the calculated book value because it was about half of the book value determination that Ellwood had related to Uddeholm in November 1990. Uddeholm informed Ellwood that it was willing to tender its shares at the Deloitte & Touche calculated value subject to Uddeholm retaining its rights to make a legal claim for an increased book value. Ellwood insisted that Uddeholm accept the calculated book value for the stock without r etaining any such right to a legal claim, threatening that otherwise it would refuse Uddeholm's tender of its stock, which would keep Uddeholm responsible for 20% of EUS's over head through 1991 and beyond.

Uddeholm then brought suit in the District Court, contending that the Deloitte & Touche book value calculation was understated because the profits that Ellwood collected on the ingots that were sold to third parties should have gone to EUS (and thus 20% to Uddeholm), rather than directly and solely to Ellwood. Uddeholm alleged in an amended complaint that Ellwood had violated S 2.3 of the Steel Purchase Agreements by claiming rebates on these sales when the sales were not "purchases" as the term is used in that section. On November 14, 1991, the parties entered into a stipulation under which Uddeholm tendered its shares of EUS to Ellwood (thus ending the joint venture), while payment for Uddeholm's shares would be made pursuant to an order of the District Court at the resolution of this litigation.

After the termination of the joint ventur e in November 1991, Ellwood created the Ellwood Specialty Steel Company (ESS) to sell common grades of tool steel. Ellwood r ecruited Ake Sundvall, a former president of Uddeholm who at that time was working for an Austrian steel company, A vesta, to become president of ESS. While Sundvall was still working at Avesta, Ellwood sent Uddeholm's confidential pricing, shipping, and customer information to Sundvall at his

Avesta office, an act which Uddeholm argues was a misappropriation of its trade secrets because Avesta was a competitor of Uddeholm's in the steel market. Uddeholm also contends that Sundvall and other Ellwood officials improperly persuaded sales representatives to leave Uddeholm for ESS, and then used these representatives to solicit and sell tool steel to Uddeholm's customers in violation of the non-competition provisions of the Agreement. Uddeholm asserts that ESS sold over $13 million worth of steel to Uddeholm's customers between 1991 and 1994, dramatically undercutting Uddeholm's share of the steel market.

From the time the joint venture was terminated through May 1992, Uddeholm bought steel from Ellwood. During this time, Uddeholm did not pay Ellwood for approximately $345,000 worth of steel. Uddeholm does not dispute the existence of this debt, but the parties disagree over the rate of interest that should be applied to it. Ellwood argues that an 18% interest rate (which is the rate on its invoice order form and the standard rate it charges all of its customers) should apply, while Uddeholm argues that the statutory 6% rate should apply, as the steel was bought under an agreement that did not involve Ellwood's standard terms.

The disputes between Ellwood and Uddeholm over the Agreement resulted in four different civil actions which were eventually consolidated. At trial, the District Court found that the Agreement was ambiguous as to whether Ellwood could properly claim rebates for the steel ingots sold to third parties, and it therefore sent the issue of the correct interpretation of the Agreement to the jury. The court also instructed the jury that Ellwood had the burden to prove by a preponderance of the evidence that these transactions were in accord with the terms of the Agreement. The jury returned a special verdict finding that Ellwood had breached the Agreement by including third party ingot sales in its rebate calculations, and awarded Uddeholm $4.1 million in compensatory damages and interest. The jury also found that Ellwood and David Barensfeld (a director of both EUS and Ellwood) had breached their fiduciary duties to Uddeholm, and awarded $45,000 in compensatory and $85,000 in punitive damages

9

for Ellwood's breach, and $70,000 in compensatory and $300,000 in punitive damages for Barensfeld's breach. The jury found further that Ellwood had breached the Agreement's non-competition clauses and committed the torts of misappropriation of trade secr ets and civil conspiracy; it awarded compensatory damages of $1 million on the non-compete claim, $150,000 on the misrepresentation claim, and $70,000 in punitive damages on the civil conspiracy claim. (The jury exonerated the other alleged co-conspirators.) The District Court enter ed a final judgment in this case on July 1, 1999.

The parties reserved the issue of inter est for post-trial determination. After the verdict, the District Court ruled on this issue and various post-trial motions. The court found that the post-venture steel was purchased under an agreement that did not include Ellwood's standard terms as printed on its steel invoices, and thus the court applied the statutory 6% interest rate instead of the 18% invoice rate. The District Court also rejected Ellwood's ar gument that the rebates that Ellwood received between January 1 and November 14, 1991 should be excluded from the damages computation. The District Court then entered a superseding final judgment in favor of Uddeholm for $9,458,210.86 on September 13, 1999.

This appeal timely followed.2 Because the appeal presents a plethora of issues, not all of which have been r eferenced above, it will be useful to set them forth seriatim, couched in terms of Ellwood's contentions:

> 1. Did the District Court err in finding that the Agreement was ambiguous as a matter of law regarding whether Ellwood could pr operly claim rebates for third-party sales of ingots pr oduced by EUS (in contrast to being limited to rebates on purchases for its own use, which Uddeholm claims was the clear intent of the contracting parties)?

> 2. Did the District Court err in its instruction to the jury that Ellwood had the burden of establishing

_____

2. The District Court had jurisdiction over this action pursuant to 28 U.S.C. S 1332, and we have jurisdiction pursuant to 28 U.S.C. S 1291.

10

the meaning of disputed contract terms in the Agreement?

3. Did the District Court err in other jury instructions

   i) by not specifically identifying the allegedly ambiguous terms in the Agreement and the alternative interpretations of these ter ms;

   ii) by giving insufficient instruction on the applicable principles of contract interpretation;

   iii) by giving the instruction that it was "undisputed" that both parties were to"share the benefits" of the joint venture, which Ellwood alleges was biased in favor of Uddeholm's interpretation of the Agreement;

   iv) by giving an instruction on pr oving damages for lost profits from a breach of a covenant not to compete which Ellwood alleges was a misstatement of Pennsylvania law; and

   v) by not instructing the jury that it should decide whether Ellwood's 420 Series of steel fell into the category of "tool steel" as defined under the covenant not to compete?

4. Did the District Court err in allowing the jury to consider the misappropriation of trade secr ets tort claim because the behavior that was alleged to constitute this breach was covered by the terms of the Agreement?

5. Did the District Court err in allowing the jury to consider the breach of fiduciary duty claims because the behavior that was alleged to constitute this breach was also covered by the ter ms of the Agreement?

6. Did the District Court err in allowing the jury to consider the breach of fiduciary claim against David Barensfeld (a director of both Ellwood and EUS), because, as Ellwood alleges, Uddeholm lacked standing to sue Barensfeld for this alleged breach?

11

7. Can Ellwood be liable for civil conspiracy given that all of the alleged co-conspirators were exonerated by the jury, and was this issue preserved in the District Court?

8. Did the District Court err in allowing Uddeholm to recover damages that included the rebates received by Ellwood from EUS in 1991?

9. Did the District Court err in admitting an affidavit by Bo Jonsson into evidence?

10. Did the District Court err in requiring redaction in the Bertil Rydstad memo before admitting it into evidence?

11. Did the District Court err by applying the statutory 6% interest rate instead of Ellwood's standard 18% rate to money that Uddeholm owed Ellwood for post-venture purchases of steel?

We address in the main text of this opinion only the issues numbered 1, 2, 4, 5, and 7 through 11. Ellwood's contentions listed in numbers 3 and 6 are addr essed in the margin infra at footnotes 9 and 13; we summarily affirm the District Court on those issues.

II. Was the Agreement Ambiguous?

The District Court found, as a matter of law, that the Agreement was ambiguous as to whether Ellwood could make sales to third parties of ingots pr oduced by EUS, keep the profits from these sales to itself, and get rebates on these sales when its contributions to EUS's over head reached more than 80% of EUS's total over head costs. The court thus sent the matter of the interpretation of the Agreement to the jury, which found that Ellwood breached the Agreement and awarded Uddeholm $4.1 million in compensatory damages and interest for this br each. Ellwood challenges the District Court's deter mination that the contract was ambiguous. We have plenary r eview of this matter. See Pacitti v. Macy's, 193 F .3d 766, 773 (3d Cir. 1999); Harley-Davidson, Inc. v. Morris, 19 F .3d 142, 145 (3d Cir. 1994).

12

The main disputed part of the Agreement is the following provision, which is contained in the Steel Pur chase Agreement between EUS and Ellwood:

> S 2.3 Price Adjustment or Rebate for Contribution. Within 90 days after the end of each calendar year of Seller [EUS], the prices with respect to the purchase of Products during the preceding calendar year by Buyer [Ellwood] shall be adjusted by way of r ebate (after giving effect to quarterly estimated allowances) if Buyer's Purchases (net of retur ns and allowances) in any year constitute more than 80% of the aggr egate amount received by Seller in such year in excess of aggregate above defined "base costs" for such year (hereinafter for this Section 2.3 referr ed to as "Contribution").

(emphasis added). Ellwood argues that this clause unambiguously allowed it to get rebates on all its purchases from EUS when Ellwood's contribution to EUS's overhead surpassed 80%, regardless of whether Ellwood turned around and immediately sold the purchased ingots to third parties.

Uddeholm responds that this clause is ambiguous because it is not clear on its face whether "Buyer's Purchases" is limited to purchases for the buyer's own use only. Uddeholm contends that other evidence (both contained within the Agreement and extrinsic to it) shows that the disputed clause is limited to purchases for the buyer's own use, and thus the ingots that Ellwood bought from EUS and resold did not count as "Buyer's Purchases" for rebate calculation purposes. As we have noted, the District Court accepted Uddeholm's contention that the Agreement was ambiguous and sent the issue of interpreting the Agreement to the jury, which agreed with Uddeholm's proffered interpr etation of the Agreement. Our task is to review this determination by the District Court, which requires us to examine the principles of contract interpretation under Pennsylvania law. Both parties agree that Pennsylvania law governs this case.

A. Pennsylvania Law on Contract Interpretation

Pennsylvania law on contract interpretation and ambiguity is somewhat complicated; while the br oad

13

principles are clear, it is not a seamless web, and hence we will have to review some of the relevant Pennsylvania cases before applying the law to the facts at bar . Pennsylvania contract law begins with the "firmly settled" point that "the intent of the parties to a written contract is contained in the writing itself." Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. Ct. 1993) (citing Steuart v. McChesney, 444 A.2d 659 (Pa. 1982)). " `Where the intention of the parties is clear, there is no need to r esort to extrinsic aids or evidence,' " instead, the meaning of a clear and unequivocal written contract " `must be determined by its contents alone.' " Steuart, 444 A.2d at 661 (quoting East Crossroads Ctr., Inc. v. Mellon–Stuart Co., 205 A.2d 865, 866 (Pa. 1965)). "[W]here language is clear and unambiguous, the focus of interpretation is upon the ter ms of the agreement as manifestly expressed , rather than as, perhaps, silently intended." Id."Clear contractual terms that are capable of one reasonable interpr etation must be given effect without reference to matters outside the contract." Krizovensky, 624 A.2d at 642.

A court may, however, look outside the "four corners" of a contract if the contract's terms are unclear: "[w]here the contract terms are ambiguous and susceptible of more than one reasonable interpretation, . . . the court is free to receive extrinsic evidence, i.e., par ol evidence, to resolve the ambiguity." Id. But because Pennsylvania presumes that the writing conveys the parties' intent, a contract

> will be found ambiguous if, and only if, it is r easonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir. 1995) (quoting Samuel Rappaport Family Partnership v. Meridian Bank, 657 A.2d 17, 21–22 (Pa.

14

Super. Ct. 1993)) (internal quotation marks omitted). To determine whether ambiguity exists in a contract, the court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." Mellon Bank, N.A. v. Aetna Bus. Credit, Inc. , 619 F.2d 1001, 1011 (3d Cir. 1980).

Ambiguity in a contract can be either patent or latent. While a patent ambiguity appears on the face of the instrument, "a latent ambiguity arises fr om extraneous or collateral facts which make the meaning of a written agreement uncertain although the language ther eof, on its face, appears clear and unambiguous." Duquesne Light, 66 F.3d at 614 (citing Easton v. Washington County Ins. Co., 137 A.2d 332 (Pa. 1957)). A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract. "[L]est the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to `the parties linguistic reference.' . . . [T]he parties' expectations, standing alone, are irrelevant without any contractual hook on which to pin them." Id. at 614 & n.9 (quoting Mellon Bank, 619 F.2d at 1011 n.12) (emphasis added).

Furthermore, the alternative meaning that a party seeks to ascribe to the specific term in the contract must be reasonable; courts must resist twisting the language of the contract beyond recognition. "In holding that an ambiguity is present in an agreement, a court must not rely upon a strained contrivancy to establish one; scarcely an agreement could be conceived that might not be unreasonably contrived into the appearance of ambiguity. Thus, the meaning of language cannot be distorted to establish the ambiguity." Steuart, 444 A.2d at 663.

Pennsylvania law on ambiguity in contracts thus seems to contain a built-in tension between two principles: (1) a contract is not ambiguous, and thus must be interpr eted on its face without reference to extrinsic evidence, "if the

15

court can determine its meaning without any guide other than a knowledge of the simple facts on which, fr om the nature of the language in general, its meaning depends," Duquesne Light, 66 F.3d at 614 (quoting Meridian Bank, 657 A.2d at 21–22); and (2) contractual terms that are clear on their face can be latently ambiguous, and "Pennsylvania law permits courts to examine certain for ms of extrinsic evidence in determining whether a contract is ambiguous." Id. Thus, when a court is faced with a contract containing facially unambiguous language, it seems that Pennsylvania law both requires that the court interpr et the language without using extrinsic evidence, and allows the court to bring in extrinsic evidence to prove latent ambiguity.

Mellon Bank resolves this tension by allowing only extrinsic evidence of a certain nature to establish latent ambiguity in a contract; a court should deter mine whether the type of extrinsic evidence offered could be used to support a reasonable alternative interpr etation under the precepts of Pennsylvania law on contract interpretation.3 See Mellon Bank, 619 F.2d at 1011–14. Once the court determines that a party has offer ed extrinsic evidence capable of establishing latent ambiguity, a decision as to

_____

3. In particular, we think that the key inquiry in this context will likely be whether the proffered extrinsic evidence is about the parties' objectively manifested "linguistic reference" regarding the terms ofthe contract, or is instead merely about their expectations. Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F .3d 604, 614 (3d Cir. 1995). The former is the right type of extrinsic evidence for establishing latent ambiguity under Pennsylvania law, while the latter is not. See id. For example, if the evidence showed that the parties nor mally meant to refer to Canadian dollars when they used the term"dollars," this would be evidence of the right type. See id. at 1011 n.12. Evidence regarding a party's beliefs about the general ramifications of the contract would not be the right type to establish latent ambiguity. See id. at 1014 (rejecting extrinsic evidence that showed that one party to a disputed contract thought it bore some risk of borrower's default as insufficient to vary the clear meaning of the term "insolvent" as used in the contract). Put another way, a party offers the right type of extrinsic evidence for establishing latent ambiguity if the evidence can be used to support "a reasonable alternative semantic reference" for specific terms contained in the contract. Mellon Bank N.A. v. Aetna Bus. Cr edit, Inc., 619 F.2d 1001, 1012 n.13 (3d Cir. 1980). See infra pp. 22–26 & n.4.

which of the competing interpretations of the contract is the correct one is reserved for the factfinder, who would examine the content of the extrinsic evidence (along with all the other evidence) in order to make this deter mination. See Mellon Bank, 619 F.2d at 1011, 1013-14. We will follow Mellon Bank's approach.

Of course, any use of extrinsic evidence to support an alternative interpretation of facially unambiguous language must be careful not to cross the "point at which interpretation becomes alteration of the written contract." Id. at 1011. This point is not clearly defined by Pennsylvania law. However, even a brief examination of the particular facts and holdings of some repr esentative cases involving contract ambiguity summarized in the mar gin establish that: (1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous; (2) each party's pr offered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the pr offered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning.4

_____

4. In Steuart v. McChesney, 444 A.2d 659 (Pa. 1982), the Pennsylvania Supreme Court considered whether ther e was ambiguity in a right of first refusal clause that stated that, upon the receipt of a bona fide offer,
certain real property could be pur chased at a price "equivalent to the market value of the premises according to the assessment rolls." The trial court determined that the clause was ambiguous, and that the evidence showed that the clause really meant that the property could be purchased at "not less than the market value of the premises according to the assessment rolls." The Pennsylvania Supreme Court roundly rejected this determination. "T o no extent is the term `equivalent', meaning `equal', interchangeable with `not less than', and, since the parties specified the former, they shall be deemed to have intended the same," despite the fact that the market value according to the assessment rolls was substantially less than several bona fide offers. Id. at 664 (footnote omitted).

Similarly, in Krizovensky v. Krizovensky, 624 A.2d 638 (Pa. Super. Ct. 1993), the Pennsylvania Superior Court reversed a trial court decision

17

In United Refining Co. v. Jenkins, 189 A.2d 574 (Pa. 1963), the Pennsylvania Supreme Court set out guidelines for an acceptable finding of ambiguity in a facially

_____

that found ambiguity in the phrase "fully r educed annuity." The trial court had concluded that, because the two parties disagreed over how to interpret this term, it was ambiguous, and thus it looked at extrinsic evidence. The Superior Court reversed because the interpretation accepted by the trial court changed the meaning of the phrase from "fully reduced annuity" to "partially reduced annuity." Since these two phrases mean entirely different things and thus in effect contradict one another (if an annuity is fully reduced it is not partially reduced, and vice versa), the Superior Court held that the parties would not have used the one term when they meant the other , because they could easily have used this other term. "The construction ur ged by [the plaintiff] changes the meaning of a clearly defined term. . . . The terms of the agreement in this case were disputed, but they wer e not ambiguous." Id. at 643. While an alternate interpretation that merely narrows or expands the definition of a term is acceptable, Krizovensky rejects the wholesale change of a term's definition.

In Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604 (3d Cir. 1995), this Court rejected the plaintiff 's contention that a contract
was ambiguous as to whether it contained a 40-year guarantee for steam generators in a nuclear power plant. The plaintif f argued that contractual language that contained an assumption of a 42-year station life in setting out technical specifications for certain components could be interpreted as providing a 40-year guarantee for the steam generators. We rejected this interpr etation as unreasonable because the "contractual hook" did not support the pr offered interpretation: "Duquesne's reading would stretch this language to unimaginable proportions, as it would turn the 42 year station life by which certain components were to be judged into an expr ess contractual guarantee that the steam generators themselves would last for 40 years." Id. at 614.

Finally, in Mellon Bank N. A. v. Aetna Business Credit, Inc., 619 F.2d 1001 (3d Cir. 1980), we considered whether sufficient evidence had been presented to justify finding ambiguity in the term "insolvent" in a contract between sophisticated commercial parties. Mellon used extrinsic evidence to argue that the liabilities and assets that accrued from the contracted-for project should not be used in determining whether a party was "insolvent" under the contract. The district court accepted Mellon's use of extrinsic evidence, but this Court reversed because "[t]he district court cited no basis in the contract document or wor ding of the

18

unambiguous term. Jenkins owed money to United and entered into a contract to sell United all the oil that he produced. The contested phrase in the oil contract stated that the contract was to continue "so long as there remains any unpaid indebtedness" of Jenkins to United. Id. at 579. Jenkins defaulted on the loan, but then argued that the oil contract was still in force and that United had to buy his oil because he still owed money to United. United ar gued that the contested phrase in the oil contract should be interpreted to mean that the agreement would continue so long as Jenkins remained indebted to United and Jenkins had not defaulted in his obligations.

The Pennsylvania Supreme Court accepted United's interpretation of the phrase, even though doing so required the court to interpret a facially unambiguous phrase as meaning something different than what it appeared to mean on its face. The court reasoned that

> if Jenkins' contention is correct, United was bound to continue purchasing all Jenkins' oil . . . even though Jenkins failed to honor his obligation to United. . . . Such an interpretation of the language of this contract is both absurd and unreasonable. Under such an interpretation, Jenkins could take his pr ofits from the "oil runs", dishonor his obligations to United and United would be bound indefinitely to the agr eement.

---

insolvency clause for its conclusion." Id. at 1009. While the term "insolvent" served as the basic contractual hook for Mellon's argument, there was scant further evidence in the contract itself to support Mellon's alternative interpretation, which in effect "made the [insolvency] condition a nullity." Id. at 1013. Such a radical re-interpretation, without evidence to support it in the actual wording of the contract, was "an impermissible rewriting of the words of the contract." Id. at 1008. Inour analysis, we differentiated between using extrinsic evidence to support an alternative interpretation of a ter m that sharpened its meaning (legitimate) and an interpretation that completely changed the meaning (illegitimate): "extrinsic evidence may be used to show that `Ten Dollars paid on January 5, 1980,' meant ten Canadian dollars, but it would not be allowed to show the parties meant twenty dollars." Id. at 1013. We thus held that there was no latent ambiguity in the contract.

19

Id. at 580. Thus, Jenkins stands for the proposition that, if the plain meaning of a contract term would lead to an interpretation that is absurd and unreasonable, Pennsylvania contract law allows a court to construe the contract otherwise in order to reach "the only sensible and reasonable interpretation" of the contract. Id.

To summarize: a contract that is unambiguous on its face must be interpreted according to the natural meaning of its terms, unless the contract contains a latent ambiguity, whereupon extrinsic evidence may be admitted to establish the correct interpretation. However, a claim of latent ambiguity must be based on a "contractual hook": the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face. In other words, the ambiguity inquiry must be about the parties' "linguistic reference" rather than about their expectations. Duquesne Light, 66 F.3d at 614. Furthermore, a proffered alternative meaning for the contractual hook must be reasonable; that is, it must be supported by contractual evidence that goes beyond the party's claim that the contractual hook has a certain meaning, and the interpretation cannot contradict the standard meaning of a term when the parties could have easily used another term to convey this contradictory meaning. In determining whether latent ambiguity exists in a facially unambiguous contract, a court must consider whether the extrinsic evidence that the proponent of the alternative interpretation seeks to offer is the type of evidence that could support a reasonable alternative interpretation of the contract, given the foregoing principles. Finally, a court can consider an alternative interpretation of a facially unambiguous contract term when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome. With these precepts in mind, we turn to the issue before us.

B. The Interpretation of the Agreement

Ellwood argues that the language in the Agreement that concerns rebates on purchases of steel from EUS is

20

straightforward and unambiguous. Section 2.3 of the Steel Purchase Agreement, which is the section covering the award of rebates, states that rebates shall be given if "Buyer's Purchases . . . constitute mor e than 80%" of EUS's overhead. Ellwood contends that the wor d "purchases" as used in this section has an accepted meaning: Black's Law Dictionary defines a "purchase" as the"[t]ransmission of property from one person to another by voluntary act and agreement, founded on a valuable consideration." Black's Law Dictionary 1110 (5th ed. 1979). There is no express limitation on the purpose for which the purchases can be made anywhere in the Agreement. Thus, Ellwood argues, "purchases" in S 2.3 of the Steel Purchase Agreements unambiguously includes all purchases, so that Ellwood rightfully received rebates on the steel ingots it purchased from EUS and immediately sold to third party customers. Ellwood further asserts that Uddeholm has not pr ovided a reasonable alternative interpretation of "purchases," so that the District Court should have interpreted"purchases" in this straightforward manner, and thus should not have sent the interpretation of the Agreement to the jury. See Mellon Bank, 619 F.2d at 1011.

In contrast, Uddeholm's argument not only focuses on the term "Buyer's Purchases" inS 2.3 as the main "contractual hook" in its ambiguity ar gument, but also points to other provisions in the Agreement that support its interpretation that "Buyer's Purchases" in S 2.3 really means "purchases for Ellwood's/Uddeholm's own use only." As we noted above, this use of other provisions of the Agreement comports with Pennsylvania law, which provides that a court should look to the contract as a whole for guidance in interpreting a term in the contract. See Duquesne Light, 66 F.3d at 615 (finding support for the court's interpretation of contested ter ms by examining the "format, construction and terms of the contract generally").

Uddeholm first points to a provision in the Shareholders Agreement (which is one of the contracts that comprise the Agreement) stating that "[u]nless the Shareholders shall agree otherwise, the total steel and other alloy metal output of EUS shall be purchased by the Shareholders in accordance with such Steel Purchase Agr eements."

21

Uddeholm argues that the most natural r eading of this statement is that outside sales were not per mitted absent the consent of both parties, and that if Ellwood could unilaterally use the joint venture to make sales to third parties as it pleased while keeping 100% of the benefits, there never would be a reason for the parties to "agree otherwise" and thus change the Agreement r equirements on purchasing ingots. These provisions would thereby become meaningless, which would violate the well-established principle of contract construction "that a contract should be read so as to give meaning to all of its ter ms when read as an entirety." Contrans, Inc. v. Ryder Truck Rental, Inc., 836 F.2d 163, 169 (3d Cir. 1987) (applying Pennsylvania law, citing Monti v. Rockwood Ins. Co., 450 A.2d 24, 26 (Pa. Super. Ct. 1982)).

Second, Uddeholm points to a provision of the Business Plan (which is incorporated into the Agreement, see supra at page 6) that states that ingots "shall be cast in a variety of shapes and weights according to the r equirements of Ellwood City Forge and Uddeholm Tooling AB." Uddeholm argues that the term "requir ements" in this provision impliedly refers to requirements for the internal use of Ellwood and Uddeholm; if the parties had intended otherwise, it submits, they would have used the phrase "according to the specifications or dered by Ellwood and Uddeholm," or "according to the r equirements of Ellwood, Uddeholm, and designated third parties."5 That is, because the process of making steel ingots involves casting each ingot to a specific shape and weight while the ingot is still hot (thus avoiding wasting excess steel), and because these specifications are determined by the ultimate end product into which the ingot will be forged, Uddeholm argues that casting ingots "according to the r equirements of Ellwood City Forge" means tailoring the ingot to ECF 's own forging process.

Third, the Business Plan also states that the joint

---

5. The latter is the phrasing that Ellwood pr oposed for the Business Plan during negotiations, but this proposal was r ejected by Uddeholm because Uddeholm made it clear that it wanted the ingot purchases limited to the shareholders' own use. See supra at page 6.

22

venture's purpose was "to supply high quality ingot to its owners, Ellwood City Forge Corporation and Uddeholm Tooling AB." (emphasis added) Uddeholm submits that the term "supply" in this clause clearly connotes a purpose to provide steel for Uddeholm's and Ellwood's own use in their steel toolmaking processes rather than for the immediate resale of the raw steel ingots. Uddeholm argues that one normally "supplies" raw materials to a manufacturer who then uses those materials himself; one does not normally "supply" raw materials to a middleman who then resells them.

These three sections of the Agreement, along with S 2.3 of the Steel Purchase Agreements, are sufficient to serve as the required "contractual hook" in Uddeholm's ambiguity argument.6 Uddeholm's proffered interpretation of these sections does not contradict the common meaning of the terms contained therein but merely narrows those meanings, and Uddeholm's interpretation is reasonable when the sections are considered together . Uddeholm's reading of these sections thus serves to cast doubt on Ellwood's claim that S 2.3 is unambiguous. Our next step is to examine the extrinsic evidence that Uddeholm offers to support its alternative interpretation ofS 2.3.7

First, Guy Asterius, the Uddeholm General Counsel, testified at trial that the parties discussed sales to third parties during the negotiations leading up to the joint venture, and agreed that such sales might sometimes be necessary, but only if both shareholders agreed, and only in the marginal case. He testified that the parties understood that, other than in such marginal cases, the tool steel that

_____

6. Ellwood points out that S 5.2 of the Steel Purchase Agreements (dealing with the inspection of ingots bought from EUS) provides that "[d]efects attributable to shipment from the Steel Mill to Buyer or Buyer's
customer shall be the responsibility of the Buyer." (Emphasis added.) Although this language does support Ellwood's interpretation of the Agreement as allowing third-party sales, it is not enough to undermine Uddeholm's argument that other sections of the Agreement raise a question of ambiguity on this issue.

7. As we stated earlier, our concern here is whether Uddeholm's proffered extrinsic evidence could be used to support a reasonable alternative interpretation of the Agreement. See supra note 3.

23

EUS provided was to be used only for the two shareholder's businesses.

Other evidence showed that, after preliminary discussions, Ellwood sent to Asterius a proposed version of the Business Plan for EUS which provided that, while the principal purpose of EUS was to supply ingots to the owners, the secondary purpose was to earn the maximum profit "from sale of its product to third parties." The proposal included other references to sales by EUS to third parties, such as a provision that ingots shall be cast according to the requirements of Uddeholm, Ellwood, and "third party purchasers." Uddeholm was surprised over the inclusion of the references to thir d party sales in Ellwood's proposal, and it met with Ellwood in or der to clarify its understanding that the purpose of the joint ventur e was to supply ingots for Ellwood's and Uddeholm's use only. Thereafter, all references in the Agreement to third parties and third party sales were deleted, including the provision about the secondary purpose of EUS. Uddeholm contends that this evidence strongly supports the infer ence that, after these deletions, both parties understood that large volume third-party sales were not pr ovided for under the Agreement.

Finally, Bo Jonsson, who was the President of Uddeholm and also sat on the EUS board of directors, stated in an affidavit that

> During that time [1986–88] . . . I agr eed to the sale of raw carbon and alloy steel ingots to third parties unrelated to either Uddeholm or ECF on the basis that such sales were necessary to help fill up EUS's steel mill and/or optimize production. . . . I also agreed to third party ingot sales because defendant Bar ensfeld represented to me that there would be at least some contribution received by EUS as a result of these sales; i.e., that EUS would receive from these sales some amount over and above the actual manufacturing cost or "base cost" of the steel ingots produced for sale to third parties. . . . I agreed on behalf of Uddeholm to the sale of raw steel ingots to third parties, but only as a temporary, short term strategy for EUS. I did not agree

24

> to open-ended, unlimited sales of raw steel ingots by
> ECF to third parties.

We are persuaded (as was the District Court) by Uddeholm's argument that Asterius's testimony, Jonsson's affidavit, and the other evidence described above strongly supports the inference that Uddeholm had clearly communicated its understanding of the allowability of third party sales under the Agreement to Ellwood. 8 We note additionally that it is a central principle of contract interpretation that if a party knew or had r eason to know of the other parties' interpretation of ter ms of a contract, the first party should be bound by that interpr etation. See Emor, Inc. v. Cyprus Mines Corp., 467 F .2d 770, 775 (3d Cir. 1972) ("[T]he meaning given to the words by one party should be given effect if the other party knew or had reason to know that it was in fact so given.") (quoting 3 Arthur L. Corbin, On Contracts S 537, at 51 (1960)). Uddeholm points out that Ellwood was aware of Uddeholm's interpretation of the Agreement, while Uddeholm was unawar e of Ellwood's competing interpretation; Uddeholm thus submits that Ellwood should be bound by Uddeholm's understanding. Furthermore, the extrinsic evidence pr offered by Uddeholm concerns the parties' objectively manifested linguistic reference regarding certain ter ms of the contract, rather than merely their expectations. See Dusquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir. 1995). We thus conclude that the extrinsic evidence that Uddeholm offered in support of its interpretation supports its reasonable alternative interpr etation of the Agreement.

In sum, the evidence proffered by Uddeholm, considered together, supports the conclusion that the District Court was correct in deciding that the Agreement contained latently ambiguous language and thus that the pr oper interpretation of the Agreement was an issue for the jury to

_____

8. At trial, Ellwood objected to the District Court's admission of Jonsson's affidavit into evidence, and it has appealed this ruling to this Court. For reasons set out in Section VII.C.1 infra, we will hold that the District Court did not err in admitting Jonsson's affidavit under Fed. R. Evid. 807, and hence the use of that affidavit her e to support Uddeholm's ambiguity argument is proper .

25

decide. The sections of the Agreement that Uddeholm uses as the contractual hook for its ambiguity ar gument are sufficient to ground its argument, because Uddeholm offers a reasonable alternate interpretation of these sections that does not contradict but merely narrows the plain meaning of the disputed terms. We thus find unavailing Ellwood's contention that extrinsic evidence should not have been considered because Uddeholm's alternative interpretation of the Agreement was unreasonable. When the sections of the Agreement that Uddeholm points to are considered alongside the extrinsic evidence outlined above--including the business plan, the parties' preliminary negotiations, Ellwood's rejected draft, and Jonsson's affidavit--there is considerable evidence supporting Uddeholm's claim that the Agreement was intended to set up a deal under which the parties would buy steel from EUS for their own purposes only, and would sell raw steel to thir d parties only in rare situations. Therefore, we hold that there is sufficient evidence for the District Court's conclusion that the Agreement was ambiguous as a matter of law, and thus the court did not err in sending the issue of the interpretation of the Agreement to the jury.

III. Did the District Court Err in its Jury Instructions by Shifting the Burden of Proof to Ellwood on the Breach of Contract Claim?

Ellwood contends that the District Court err ed in its instructions to the jury by putting the burden on Ellwood to establish the meaning of any ambiguous ter ms in the Agreement. We review a jury instruction to determine " `whether the charge, taken as a whole and viewed in light of the evidence, fairly and adequately submits the issues in the case to the jury' and reverse `only if the instruction was capable of confusing and thereby misleading the jury.' " Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1259 n.15 (3rd Cir. 1991) (en banc) (quoting Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 922 (3d Cir. 1986)). We exercise plenary review, however, over whether the District Court correctly stated the legal standard for the burden of proof in its jury instructions. See United States v. Johnstone, 107 F.3d 200, 204 (3d Cir. 1997).

26

When the District Court sent the matter of the interpretation of the Agreement to the jury, it stated that, although ordinarily a party asserting that a contract was breached carries the burden of proving the breach, where a fiduciary relationship exits the burden shifts to the fiduciary to prove the absence of a br each. Because the court found that a fiduciary relationship existed between Ellwood and Uddeholm, its instructions to the jury placed the burden on Ellwood to establish the meaning of any ambiguous contract terms, even though Uddeholm was the party asserting the breach of contract. Ellwood contends that the District Court erred in shifting the burden of proof in this manner. Since this issue concer ns the District Court's description of a legal standard in the jury instructions, our review is plenary.

The court found that there was a fiduciary r elationship between Ellwood and Uddeholm because Ellwood was the majority shareholder in a joint venture. A shareholder in such a position is under close scrutiny, and is expected to conform to the highest standards of conduct. See Ferber v. American Lamp Corp., 469 A.2d 1046, 1050 (Pa. 1983) ("It has long been recognized that majority shar eholders have a duty to protect the interests of the minority."); Snellbaker v. Herrmann, 462 A.2d 713, 718 (Pa. Super . Ct. 1983) ("[A] joint venturer owes a duty of the utmost good faith and must act towards his associate with scrupulous honesty."). When occupying such a position, it is a breach of fiduciary duty to act to benefit oneself at the expense of the minority shareholder. See Ferber, 469 A.2d at 1050. Pennsylvania law shifts the burden onto the fiduciary to prove that a transaction is fair and not fraudulent when thefiduciary acts to benefit himself while in the fiduciary r ole. See Ruggieri v. West Forum Corp., 282 A.2d 304, 307 (Pa. 1971) ("[O]nce a fiduciary or confidential r elationship is shown to exist, the burden is shifted to [the fiduciary] . . . to prove absence of fraud, and that the transaction was fair and equitable."); In re Estate of Harrison , 745 A.2d 676, 682 (Pa. Super. Ct. 2000); Dresden v. W illock, 518 F.2d 281, 290 (3d Cir. 1975).

Because Pennsylvania law shifts the burden onto fiduciaries to prove the fairness of a self-benefitting

27

transaction, and because Ellwood was a fiduciary as the majority shareholder in the joint venture, Uddeholm requested the District Court to place the burden on Ellwood to establish the meaning of the disputed terms in the Agreement. The District Court acceded to this request, but it cautioned the plaintiff's counsel that this was a risky move:

> You know, you realize that the plaintiff takes considerable risk in this case going to the jury this way. And what I mean is, if the plaintiff is confident on the merits of its case, this little burden shifting thing which I think interests Judges and lawyers more than it does juries because of the uncertainty in the law, and we have no idea what the Court of Appeals for the Third Circuit might say about this ruling, the plaintiff takes considerable risk in submitting it in this fashion. And it may be doing you a disservice, but inasmuch as it was what you requested, or some of what you requested, and because I think, in good faith, that it is the law of Pennsylvania, that is the way it is going in.

The District Court's trepidation about shifting the burden onto Ellwood here was well-founded. Although it would seem to comport with Pennsylvania law to put the burden on a fiduciary to establish the meaning of disputed terms in a contract between the fiduciary and the beneficiary, we need not decide that issue, because Ellwood and Uddeholm were not in a fiduciary relationship when the Agreement was negotiated and executed. Ellwood's fiduciary duty to Uddeholm arose after the Agreement was executed: the Agreement created the joint venture, which itself then gave rise to the fiduciary relationship. See Snellbaker, 462 A.2d at 716 ("The rights, duties, and obligations of joint venturers, as between themselves, depend primarily upon the terms of the contract by which they assume the relationship."); see also In Re Estate of Clark, 359 A.2d 777, 781 (Pa. 1976) (stating that it is "well-settled" that if a party contesting a gift shows that a confidential or fiduciary relationship between the donor and donee existed at the time of the gift, the burden then shifts to the donee to show that the gift was free of any taint of undue influence or deception); Weisbecker v. Hosiery Patents, Inc., 51 A.2d

28

811, 813–14 (Pa. 1947) (fiduciary duty to a minority shareholder arises as a result of being a majority shareholder).

Although an asymmetry in power did arise between these parties after the Agreement was signed, no such asymmetry existed when the parties were hammering out its disputed and ambiguous terms, as the parties wer e not then in a majority-minority shareholder relationship in a joint venture. Thus, the reason for placing the burden of proof on a fiduciary in breach of contract cases––the fiduciary is in a position of control over the beneficiary or his property, and must therefore meet a higher standar d in his dealings with the beneficiary––does not apply to this case. See Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409, 421 (2d Cir. 1999) (noting that a fiduciary has the burden of proof to explain a transaction which benefits himself at the expense of his beneficiaries because a "suspicion naturally arises that the fiduciary has gained by taking advantage of its special relationship"); Ferber, 469 A.2d at 1050 (stating that a majority shareholder's fiduciary duty to minority shareholder prevents him from using his power as a majority shareholder to deprive minority of a proper share of the benefits from the enterprise). While it makes perfect sense to place the burden on a fiduciary to explain business actions which benefitted itself over its beneficiary, the same logic does not hold for a br each of contract when there are dueling interpr etations of the contract entered into at arms length by sophisticated corporations who are not in any kind of fiduciary relationship at the time the contract is for med.

Uddeholm cites no cases in which a fiduciary r elationship that was created by a contract caused a court to shift the burden of proof on the interpretation of that contract. All of the cases Uddeholm cites in support of its position shift the burden of proof onto the fiduciary because, at the time the questionable transaction was consummated by the defendant, the defendant already had an unequal or fiduciary relationship with the plaintif f. See, e.g., Weisbecker, 51 A.2d at 813–14; Snellbaker, 462 A.2d at 716; Martinelli, 196 F.3d at 421; Bellis v. Thal, 373 F. Supp. 120, 125–27 (E.D. Pa. 1974), aff 'd 510 F.2d 969 (3d Cir.

29

1975). Because it is hornbook law that (when no fiduciary relationship exists) the party alleging a br each of contract bears the burden of proving the elements of a breach of contract, the District Court should have placed the burden of proving the meaning of ambiguous ter ms in the Agreement on Uddeholm, not Ellwood. See In re Estate of Dixon, 233 A.2d 242, 244 (Pa. 1967) ("In any contract action, . . . the claimant bears the burden of proving the terms of the contract." ). Uddeholm does not assert, nor could it credibly, that this burden-shifting error was harmless. Therefore, the jury ver dict on this claim must be set aside, and the case remanded for a new trial.9

_____

9. Ellwood maintains that several of the District Court's other instructions to the jury were in error as well. First, Ellwood contends that the court erred in giving an instruction that "[t]here is no dispute that ECF and Uddeholm formed a venture . . . from which both parties would share the benefits." Ellwood asserts that this was tantamount to directing a verdict for Uddeholm. W e find no merit in this contention. Whether EUS was a "cost center" (as Ellwood contends) or a "profit center" (as Ellwood denies), the purpose of the Agreement was to benefit both sides, thus the "share the benefits" instruction left room for the two parties to present their varying theories on the way in which the benefits were to be shared. The "share the benefits" instruction, taken in the context of the jury instruction as a whole and viewed in light of the evidence, fairly submitted the issues to the jury and was not particularly liable to confuse or mislead the jury. See Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991) (en banc). This contention is therefore without merit.

Ellwood also argues that the District Court erred by failing to include the following four matters in its jury instructions: (1) an identification of the specific disputed language from the Agr eement along with the parties' competing interpretations of that language; (2) a description of the relevant evidentiary and contract interpr etation principles; (3) an instruction on the proximate cause requir ement for measuring damages for a breach of a covenant not to compete; and (4) an instruction that the jury was to decide whether a type of steel that Ellwood produced after the joint venture ended (the "420 series" of steel) was generally regarded as "tool steel." We review a district court's decision not to include a party's proffered jury instruction for abuse of discretion. See United States v. Pitt, 193 F.3d 751, 755 (3d Cir. 1999); Limbach, 949 F.2d at 1259 n.15 ("Failure to instruct the jury as requested does not constitute error so long as the instruction, taken as a whole, properly apprises the jury of the issues and the applicable law.") None of these omissions rise to the level of reversible err or.

30

IV. Did the District Court Err in Allowing a Separate
Breach of Fiduciary Duty Claim Against Ellwood?

The District Court allowed the jury to consider a separate
breach of fiduciary duty claim against Ellwood for behavior
that Ellwood contends was covered by the Agr eement and
hence was subsumed in the jury charge (and ver dict) for
breach of contract. Ellwood submits that Uddeholm pressed
this tort claim simply to circumvent the unavailability of
punitive damages for contract claims under Pennsylvania
law. The issue of whether the fiduciary duty claim is
allowable here is a question of law over which our review is
plenary. See Duquesne Light Co. v. Westinghouse Elec.
Corp., 66 F.3d 604, 618 (3d Cir. 1995).

Pennsylvania courts use two methods to deter mine
whether tort claims that accompany contract claims should
be allowed as freestanding causes of action or rejected as
illegitimate attempts to procure additional damages for a
breach of contract: the "gist of the action" test and the
"economic loss doctrine" test.10  Under the "gist of the
action" test,

_____

The District Court's instructions directed the jury to interpret certain
sections of the Agreement. There is no authority to support Ellwood's
claim that the court had to point out specific ter ms in the Agreement
that were the focus of the ambiguity dispute, especially when
Uddeholm's position was that the terms wer e ambiguous in the context
of the Agreement as a whole. Furthermor e, the record supports the
conclusion that the court adequately instructed the jury on the relevant
legal principles. Ellwood's claim that the District Court did not
adequately instruct the jury on the proximate cause requirement for
damages is plainly lacking in merit when portions of the court's
instructions not mentioned by Ellwood are considered, as it is clear that
the court's full jury instruction properly apprised the jury of the
relevant
law. Finally, the record is clear that the District Court's decision to
omit
an instruction concerning the jury's r ole in deciding whether the "420
series" was generally regarded as "tool steel" was based on the court's
concern for jury confusion. In our view, this decision was not an abuse
of discretion.

10. While the Pennsylvania Supreme Court has neither accepted nor
rejected the economic-loss doctrine, Pennsylvania intermediate appellate

> to be construed as a tort action, the [tortious] wrong
> ascribed to the defendant must be the gist of the action
> with the contract being collateral. . . . [T]he important
> difference between contract and tort actions is that the
> latter lie from the breach of duties imposed as a matter
> of social policy while the former lie for the breach of
> duties imposed by mutual consensus.

Redevelopment Auth. of Cambria County v. Inter national Ins. Co., 685 A.2d 581, 590 (Pa. Super. Ct. 1996) (en banc) (quoting Phico Ins. Co. v. Presbyterian Med. Servs. Corp., 663 A.2d 753, 757 (Pa. Super. Ct. 1995)). In other words, a claim should be limited to a contract claim when "the parties' obligations are defined by the ter ms of the contracts, and not by the larger social policies embodied in the law of torts." Bash v. Bell Telephone Co., 601 A.2d 825, 830 (Pa. Super. Ct. 1992).

This Court described the "economic-loss doctrine" test in Duquesne Light as "prohibit[ing] plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." 66 F.3d at 618. Duquesne Light explained further that a plaintiff should be limited to a contract claim "when loss of the benefit of a bargain is the plaintiff 's sole loss." Id. (quotations marks omitted). Both parties argue that both tests support their positions. For the r easons set forth in the margin, we focus primarily on the "gist of the action" test.11

---

courts have applied the doctrine, see, e.g., REM Coal Co., Inc. v. Clark Equip. Co., 563 A.2d 128 (Pa. Super. Ct. 1989), and this Court has predicted that the Pennsylvania Supreme Court would adopt the version of the economic loss doctrine that the United States Supreme Court developed in East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986), see King v. Hilton-Davis, 855 F .2d 1047, 1053–54 (3d Cir. 1988).

11. The application of the economic-loss doctrine to the instant case does not quite fit because that doctrine developed in the context of courts' precluding products liability tort claims in cases where one party contracts for a product from another party and the product malfunctions, injuring only the product itself. See East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866–71 (1986); Duquesne Light, 66 F.3d at 618–20. The "gist-of-the-action" test is a better fit for
this non-products liability case.

32

Ellwood contends that the Agreement was exhaustively negotiated and completely defined the parties' r elationship and obligations, so that Uddeholm's alleged losses arose only from alleged breaches of the Agr eement. Ellwood asserts that, far from being "collateral" to the breach of fiduciary duty claim, see Redevelopment Auth. of Cambria County, 685 A.2d at 590, the Agreement was "the only articulated predicate" for that claim. Appellants' Br. at 46. Conversely, Uddeholm contends that Ellwood's r ebate claims for third-party sales and its covering up of these sales breached its fiduciary duty to Uddeholm, because such actions involved Ellwood utilizing the joint venture for its own gain to the detriment of its minority partner. Uddeholm claims that these actions by Ellwood caused losses that went beyond the scope of the Agr eement, thus giving rise to a cause of action separate fr om the breach of contract claim. Uddeholm contends further that, because the existence of a contract between two parties does not preclude one of the parties from r ecovering in tort for a breached fiduciary duty, it should be allowed to recover for Ellwood's breached fiduciary duty in this case. See Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc., 28 F. Supp. 2d 947, 951 (E.D. Pa. 1998) ("That a plaintiff may not sue in tort for economic losses arising fr om a breach of contract, however, does not pr eclude the possibility of a tort action between parties to a contract.") (applying Pennsylvania law); see also United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F .3d 1207, 1226-27 (10th Cir. 2000) (holding that, under Colorado law, a breach of fiduciary duty that arises from the parties' status as joint venturers is independent of the contract that created the joint venture, thus the economic loss doctrine does not bar such a fiduciary duty claim).

As we explained earlier, there was a fiduciary relationship between Ellwood and Uddeholm because Ellwood was the majority shareholder in a joint venture and had sole and virtually exclusive control over the object of the venture (i.e., EUS). Pennsylvania law imposes such a fiduciary duty on joint venturers, see Snellbaker v. Herr mann, 462 A.2d 713, 718 (Pa. Super. Ct. 1983), as well as on majority shareholders in their dealings with minority shareholders, see Ferber v. American Lamp Corp., 469 A.2d 1046, 1050

33

(Pa. 1983). This duty imposed obligations on Ellwood that went well beyond the particular obligations contained in the Agreement itself. See Snellbaker, 462 A.2d at 718 (stating that a fiduciary duty includes the duty to act toward one's joint venturer in the utmost good faith and with scrupulous honesty); Ferber, 469 A.2d at 1050 (noting that a fiduciary duty prevents majority shareholder fr om "using their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise," so that, when a majority shareholder acts in its own interest, this action "must be also in the best interest of all shareholders and the corporation") (emphasis omitted).

As suggested by the foregoing, the obligations that Uddeholm alleges Ellwood breached in its fiduciary duty claim were imposed "as a matter of social policy" rather than "by mutual consensus." See Redevelopment Auth. of Cambria County, 685 A.2d at 590. That is, "the larger social policies embodied in the law of torts" rather than "the terms of the contract," are what underlie Uddeholm's breach of fiduciary duty claim. Bash, 601 A.2d at 830. The "larger social policy" that defines Uddeholm's claim is the policy requiring fair dealing and solicitude fr om a majority shareholder to minority shareholders in a joint venture. See Snellbaker, 462 A.2d at 718; Ferber, 469 A.2d at 1050; William Goldstein Co. v. Joseph J. & Reynold H. Greenberg, Inc., 42 A.2d 551, 555 (Pa. 1945) (citing Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928)). W e thus conclude that Uddeholm's fiduciary duty claim meets the"gist of the action" test: the tort wrong ascribed to Ellwood is the gist of the fiduciary duty action while the Agr eement is collateral.12 See Redevelopment Auth. of Cambria County, 685 A.2d at 590. We therefore find no err or in the District Court's

_____

12. Furthermore, while it is a closer question, we also believe that Uddeholm's fiduciary duty claim passes the "economic–loss doctrine" test. Because Uddeholm asserted that Ellwood took advantage of its position as a fiduciary to Uddeholm's detriment, the harm Uddeholm claimed to have suffered goes beyond the Agreement and the benefits Uddeholm was supposed to receive under the Agr eement. See Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995).

decision to allow the jury to consider a separate br each of fiduciary duty charge against Ellwood.[13]

## V. Did the District Court Err in Allowing a Separate Misappropriation of Trade Secr ets Charge Against Ellwood?

The District Court allowed the jury to consider a misappropriation of trade secrets and confidential information claim against Ellwood, but Ellwood argues that the relationship regarding trade secr ets was covered by: (1) the license to use Uddeholm's know-how, and (2) the covenant not to compete contained in the Know-How Agreement section of the Agreement. Ellwood thus argues that the separate misappropriation claim was subsumed in the charge and verdict for breach of the covenant not to compete. Under this view, Uddeholm's misappr opriation

_____

13. Ellwood also asserts that the District Court erred in holding that David Barensfeld, a director and officer of both Ellwood and EUS, could be individually liable to Uddeholm for breach of fiduciary duty. (Ellwood states that this is an issue of whether Uddeholm had standing to sue Barensfeld, but we believe that this claim is not about Uddeholm's standing but about whether Uddeholm has a viable claim against Barensfeld.) This issue arises because the jury also awarded Uddeholm $70,000 in compensatory damages and $300,000 in punitive damages for a breach of fiduciary duty by Bar ensfeld. Ellwood argues that, under Pennsylvania law, a director's fiduciary duty runs only to the corporation and not directly to a shareholder like Uddeholm. A shareholder can enforce this duty only in the name of the corporation via a derivative action. See 15 Pa. Cons. Stat. SS 1712, 1717. Uddeholm, however, presented evidence that Barensfeld personally manipulated rebates, manipulated books and records, failed to disclose the effect of ingot sales, misrepresented the book value of EUS, and misappropriated confidential trade secrets. Under Pennsylvania law, "an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable" for the tortious activity. Wicks v. Milzoco
Builders, Inc., 470 A.2d 86, 90 (Pa. 1983). The harmed party then can sue the officer directly. See id. The above alleged activities by Barensfeld
constitute taking part in Ellwood's breach offiduciary duty. Therefore, Uddeholm had a viable claim against Barensfeld individually for his part in Ellwood's breach of its fiduciary duty, and we find no error in the District Court's instruction to the jury to consider whether Barensfeld violated a fiduciary duty to Uddeholm.

35

claim is really a claim that Ellwood's use of Uddeholm's know-how went beyond the Agreement's ter ms. The same two tests described in Section IV supra--the "gist of the action" test and the "economic loss doctrine" test--apply here for determining whether this tort claim should be allowed as its own claim or rejected as cover ed by the contract claim. See Redevelopment Auth. of Cambria County v. International Ins. Co., 685 A.2d 581, 590 (Pa. Super. Ct. 1996) (en banc); Duquesne Light Co. v. W estinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995). As in Section IV, we will primarily focus on the "gist of the action" test, see supra note 11. This issue involves a question of law subject to plenary review. See Duquesne Light, 66 F.3d at 618.

Uddeholm argues that its misappropriation of trade secrets claim is separate and independent fr om its breach of contract claim in the following way:

> Appellants had no `license' to misappropriate Uddeholm's trade secrets and confidential information, especially during the three year noncompete period. Appellants violated the noncompete covenants and cannot now claim them as a `license' to do the very thing they were contractually prohibited from doing.

Appellee's Br. at 66. The key is the last part of that passage; Uddeholm admits that Ellwood was "contractually prohibited from doing" the actions that Uddeholm contends form the basis of its misappropriation claim. But if this is the case, then "the parties' obligations ar e defined by the terms of the contract, and not by the lar ger social policies embodied in the law of torts." Bash v. Bell T elephone Co., 601 A.2d 835, 830 (Pa. Super. Ct. 1992) (outlining the gist of the action test). That is, Uddeholm admits in its own argument that the Know-How Agreement covers Ellwood's misappropriation of its know-how (the agr eement "contractually prohibited" the misr epresentation), so the "gist" of Uddeholm's misappropriation action is actually breach of contract, at least as far as the use of Uddeholm's know-how is concerned. Thus, if the jury's ver dict for Uddeholm on the misappropriation of trade secr ets and confidential information claim was based on Ellwood's

36

misappropriation of Uddeholm's know-how, the verdict cannot stand.14

However, Uddeholm argues further that, even if Ellwood's use and misuse of Uddeholm's know-how was covered by the Agreement, Ellwood's misappropriation of Uddeholm's client lists, pricing information, ship-to lists and customer profiles was sufficient to sustain the ver dict of misappropriation, since that information is confidential information and/or a trade secret but is not covered by the Know-How Agreement. Section 1.02 of the Know-How Agreement defines "Know-How" as "information (including rights under patents and license agreements, if any) proprietary to Licensor [Uddeholm] and useful in the manufacture and fabrication of Products." "Products" is in turn defined in S 1.03 as "carbon, alloy, tool, stainless and other specialty steel ingots." Section 1.02 also states that "Know-How" includes, but is not limited to, technical and engineering data and information on the manufacture and production of alloy, tool, stainless, and other specialty steel ingots.

It is clear from our parsing of SS 1.02 & 1.03 that less technical information like client lists and pr ofiles, pricing information, and shipping-to information are not included in the coverage of the Know-How Agreement. Pennsylvania law is also clear that this kind of information can be a trade secret. See Robinson Elec. Supervisory Co. v. Johnson, 154 A.2d 494, 496 (Pa. 1959) ("[C]ustomer lists and customer information . . . [are] highly confidential and constitute[ ] a valuable asset. Such data has been held to be property in the nature of a `trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract."); A.M. Skier Agency, Inc. v. Gold, 747 A.2d 936, 940 (Pa. Super. Ct. 2000) (quoting above passage from Johnson). Therefore, Uddeholm is correct that, if the jury's verdict on this claim was based on Ellwood's

_____

14. We reach a similar conclusion under the "economic loss doctrine" test, because Uddeholm's entitlement to economic losses from the misappropriation of its know-how flows only from the Agreement and not from tort. See Duquesne Light Co. v. W estinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995).

37

misappropriation of this latter type of confidential information rather than on misappropriation of know-how, then the verdict is sustainable because it passes the gist of the action and economic loss doctrine tests.

The problem with Uddeholm's argument her e is that, in its jury instructions, the District Court did not distinguish between the misappropriation of know-how and the misappropriation of these other types of confidential information. The jury's special verdict also did not distinguish between these two categories of misappropriation. Thus, we cannot deter mine whether the jury's verdict on the misappropriation claim was properly grounded on actions outside the scope of the Agreement. We therefore will set aside the ver dict for Uddeholm on the misappropriation of trade secrets claim, and remand for a determination of this claim based solely on the misappropriation of trade secrets that do not include the know-how covered by the Know-How Agreement.

VI. Ellwood's Challenge to the Civil Conspiracy Award

The jury awarded Uddeholm $70,000 in punitive damages on its civil conspiracy claim against Ellwood. Uddeholm's complaint averred that Ellwood conspired with the Ellwood Specialty Steel Company, Ellwood Quality Steel Company, Bjorn Gabrielson, and David Bar ensfeld to misappropriate its trade secrets and confidential information. The jury found Ellwood liable on the conspiracy claim but found in favor of all the r emaining conspiracy defendants (except Gabrielson, who had already been granted judgment as a matter of law under Fed. R. Civ. P. 50), which means that the jury found only one defendant liable for conspiracy. Ellwood challenges this verdict on the grounds that under Pennsylvania law, civil conspiracy requires at least two co-conspirators. See Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 473 (Pa. 1979).

Uddeholm does not dispute that two conspirators ar e required under Pennsylvania law, and that, if this issue had been preserved in the District Court, the conspiracy verdict would have to be set aside. Instead, Uddeholm

38

argues that this issue was waived because Ellwood did not clearly object on this basis at trial.15  See Medical Protective Co. v. Watkins, 198 F.3d 100, 105 n.3 (3d Cir. 1999). After the verdict, the District Court asked the parties if they wished to raise any objections to the verdict, and the court noted specifically that there appeared to be only one conspirator. The court's colloquy with the parties on this issue consisted solely of the following:

COURT: Civil conspiracy, I think they only found one defendant.

SOMMER (counsel for Ellwood): I believe that's corr ect, Your honor, just EGI.

MARTIN (counsel for Uddeholm): Yes.

COURT: That's a difficult undertaking. I would think that it would require two or more.

MARTIN: I don't think the other defendant was joined, though, and that was Mr. Sundvall, when he was out at Avesta, because EGI was the defendant in the case.

COURT: That's correct, you did ar gue that he was a co-conspirator. Is there anything else in there that pops out at you as being inconsistent?

Although Uddeholm argued that Sundvall could serve as the other co-conspirator, Sundvall had been previously granted summary judgment on all claims against him, including civil conspiracy. The issue here, then, is whether Ellwood waived its argument that it could not be the only party liable for civil conspiracy by neglecting to assert that objection at trial. Ellwood argues that it objected by agreeing with the District Court when the court raised the

_____

15. Uddeholm argues in the alternative that, since we can affirm the conspiracy verdict if it has any rational basis, we should do so because of the possibility that the jury could have concluded that one Robert Raubolt served as the other co-conspirator. This argument is without merit. Uddeholm did not even mention Raubolt as a possible co-conspirator at trial, and raised this possibility for the first time in its
reply brief. We will not reach this contention because Uddeholm waived this argument by not raising it in his opening brief. See Ghana v. Holland, 226 F.3d 175, 180 (3d Cir . 2000).

39

problem with the conspiracy verdict. Ellwood contends that it should not be required to do mor e when the District Court itself raises the objection.

Rule 46 of the Federal Rules of Civil Procedur e states that a party need not make a formal exception to a ruling or order of a court, but instead "it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which the party desires the court to take or the party's objection to the action of the court and the grounds ther efor." On the other hand, " `[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument.' " Medical Protective Co., 198 F.3d at 105 n.3 (quoting Brenner v. Local 514, United Br otherhood of Carpenters and Joiners of America, 927 F .2d 1283, 1298 (3d Cir. 1991)).

Although this issue is close, we are satisfied that Ellwood did not waive its argument that it could not be liable as the sole conspirator. It is true that Ellwood should have done more than merely agree with the District Court when the court noted the problem with the conspiracy ver dict. But passivity may be excusable when the District Court itself identifies the issue not only as problematic but as almost certain grounds for setting aside the ver dict. It would be unfair to Ellwood to penalize it for failing to jump up and down or labor an objection that the District Court had placed in the record. Therefor e, we hold that the verdict against Ellwood for civil conspiracy must be set aside, and that judgment must be entered for Ellwood on this claim.

VII. Other Challenges to Trial Rulings

A. Should Uddeholm Have Been Allowed to Recover Damages for 1991 Rebates?

On Uddeholm's breach of contract claim, the jury awarded compensatory damages for Ellwood's impr oper calculation of rebates under S 2.3 of the Steel Purchase Agreements. The parties agree that this amount included damages for Ellwood's 1991 rebates on steel pur chases from EUS. Ellwood contends that, even if Uddeholm is

entitled to rebate damages generally, it is not entitled to any damages for post-1990 rebates, because Ellwood was entitled to buy out Uddeholm's share of EUS at EUS's book value as of December 31, 1990, and in fact Ellwood initiated these buy-out proceedings. Ellwood argues that the original Shareholders Agreement is quite clear that the buy-out price for Uddeholm's shares of EUS was to be the book value of EUS as of the month preceding the buy-out notice, which Ellwood gave in January 1991. Because the buy-out price was fixed prior to the 1991 rebates, Ellwood submits that these rebates could not have affected the value of Uddeholm's shares at the buy-out, and thus Uddeholm was not entitled to damages for the 1991 rebates.

When Ellwood sought post-trial relief on this point, the District Court denied Ellwood's motion, ruling that the money the jury seemingly awarded for the 1991 rebates was really for Ellwood's breach of the Agreement in rejecting Uddeholm's tender of its EUS shares after Ellwood initiated the buy-out. The Agreement stipulates that the settlement of the sale of Uddeholm's stock to Ellwood should take place as soon as is practicable after the decision is made, and in any event within 30 days after determination of the purchase price. Ellwood, however, never paid for Uddeholm's stock and in fact rejected Uddeholm's tender of stock. This action delayed the settlement of the buy-out, and thus extended the time that Uddeholm had to pay overhead for EUS well into 1991. Since the Agreement is silent on what is to happen in such a situation, the District Court found (post-trial) that the contract was ambiguous on this point. The court therefore ruled that it had been the jury's province to decide on the proper remedy for this breach by Ellwood, and that the jury had decided to award the amount of the 1991 rebates as damages.

Ellwood raises two basic challenges to this ruling. First, it argues that the Agreement is not ambiguous on this issue: the Shareholders Agreement unambiguously fixes book value for buy-out purposes at the sending of buy-out notice, and there is no provision in the Agreement to vary this. Second, Ellwood contends that the jury was not

instructed on the issue of the ambiguity of the Agreement concerning a rejection of a share tender, nor did it return any kind of verdict on this issue in its special verdict. Ellwood thus argues that the award of the 1991 rebate damages cannot stand on the District Court's theory, because "[a] verdict cannot stand on a theory that the jury was never asked to consider." Appellants' Br. at 59.

Ellwood's argument that the Agreement was unambiguous on this issue is unavailing. Ellwood is correct that the Agreement clearly sets out the method for calculating the stock purchase price (i.e., EUS's book value) in a buy-out, but it is just as clear in the Agreement that the settlement of such a buy-out was to take place no later than 30 days after the determination of the purchase price. The settlement did not occur within the time period set by the Agreement, and there is no provision in the Agreement that provides for such a circumstance. It is simply not true that the Agreement unambiguously gives Ellwood the right to initiate the buy-out, set the purchase price for the stock, and then drag its heels for an indefinite time on the settlement of the buy-out while keeping the purchase price for the buy-out fixed--all the while collecting overhead costs from Uddeholm for EUS. Moreover , such an interpretation of the Agreement would be"absurd and unreasonable," so we will not interpret the Agreement in this manner. See United Refining Co. v. Jenkins, 189 A.2d 574, 580 (Pa. 1963). The District Court rightly concluded that the Agreement was ambiguous as to what should have occurred upon Ellwood's rejection of Uddeholm's tender, making this question an issue for the jury to consider.

As for Ellwood's contention that the District Court improperly attributed a rationale for the jury's verdict using a theory that the jury was never asked to consider , we need not decide this issue because we will set aside the jury's award on the breach of contract claim on other grounds (i.e., the burden-shifting error; see Section III supra). On remand, the District Court should instruct the jury on the issue of the ambiguity of the Agreement concerning a rejection of the share tender, so that the jury can explicitly decide whether Ellwood breached the Agreement by rejecting Uddeholm's tender, and whether the 1991 rebates

42

should be included in the damage award as a r emedy for
this breach.

B. The Interest Rate That Should Be Applied to Post-
Venture Sales of Steel.

After the joint venture between Uddeholm and Ellwood
dissipated, Uddeholm bought approximately $345,000
worth of steel from Ellwood. Both parties agr ee that
Uddeholm still owes Ellwood this $345,000 plus inter est;
this amount is to be set off against the money Ellwood will
owe Uddeholm on the claims in this lawsuit. The parties
disagree, however, over the rate of interest that should be
applied to this debt. In a post-verdict motion to the District
Court, Ellwood argued that the 18% inter est rate that it
charges all of its customers should be applied to the
$345,000 and compounded semi-annually, as that rate was
included in the terms and conditions that wer e attached to
the invoice order form used for these steel purchases.
Uddeholm counters that the statutory 6% rate should be
applied because the agreement for this steel was part of a
general commercial agreement that did not involve
Ellwood's standard terms.

In its September 13, 1999 Memorandum Order on Post-
Trial Matters, the District Court found that the steel was
purchased via an agreement "which was not confined to the
terms included on the backs of the related invoices, [ ]
which is where defendants find the pr ovision for the high
rate of interest they seek." Dist. Ct. Mem. Order, Sept. 13,
1999 at 3. The court based this conclusion partially on
evidence presented by Uddeholm that the parties entered
into a commercial agreement with dif ferent terms from
Ellwood's standard agreement, and partially on its
conclusion that it would be "logical" for these parties not to
confine their commercial dealings to the ter ms on the back
of a form invoice, given that they had worked together for
years as joint venturers. The District Court also reasoned
that the 6% rate would be "otherwise fair ," as the 6% rate
applied to all the debts that Ellwood owed Uddeholm. The
court thus applied the 6% statutory rate.

Although the District Court determination that the post-

43

venture steel sales agreement did not include the 18% invoice slip rate may be the best interpretation of the evidence adduced at trial, we cannot adequately r view this determination because the District Court neither cited to nor described the evidence on which its decision was based. Moreover, if Ellwood sent the invoice slips within a reasonable time as a "definite and seasonable expression of acceptance or a written confirmation" of an oral agreement between the parties, then 13 Pa. Cons. Stat. S 2207 (part of Pennsylvania's version of the UCC) would apply, and the terms on that invoice would become part of the agreement unless Uddeholm's original offer expressly limited acceptance to the terms of the offer , the invoice's terms materially altered the original terms, or Uddeholm objected to the new terms within a reasonable time. See 13 Pa. Cons. Stat. S 2207(a) & (b).16

However, there is not sufficient evidence in the District Court's Memorandum Order or in the recor d for us to review the District Court's determination on this issue-- indeed, it is not even clear that the District Court considered the applicability of S 2207 at all. Furthermore, the District Court's conclusion that it would be"logical" for the parties to have worked out their own deal separate from the terms on the invoice and that the 6% rate would be "fair" is insufficient to establish that there was such a deal.

_____

16. Tile 13 Pa. Cons. Stat. S 2207(a) & (b) provides that

> (a) General rule.--A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different fr om those offered or agreed upon,
> unless acceptance is expressly made conditional on assent to the additional or different terms.

> (b) Effect on contract.--The additional ter ms are to be construed as
> proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> (1) the offer expressly limits acceptance to the terms of the offer;

> (2) they materially alter it; or

> (3) notification of objection to them has alr eady been given or is given within a reasonable time after notice of them is received.

44

We therefore will vacate the District Court's order on this issue and remand so that the District Court can more specifically collect and cite evidence on the post-venture steel sales agreement between the parties in or der to show either that the 18% interest rate included in the invoice's terms did not become part of this agreement, or that the 18% rate was part of the agreement.

C. Evidentiary Challenges.

Ellwood also challenges two evidentiary rulings that the District Court made at trial. We review the District Court's evidentiary rulings for abuse of discretion. See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 517 (3d Cir. 1997).

1. The Jonsson affidavit

The District Court admitted into evidence portions of an affidavit of Bo Jonsson, a former Pr esident of Uddeholm, under Federal Rule of Evidence 807, the catchall exception to the hearsay rule. Jonsson attested to the affidavit in 1994 and died in 1996, before the trial. Uddeholm used the affidavit to counter assertions by Ellwood about what transpired at certain directors meetings that Jonsson attended in a representative capacity for Uddeholm. Rule 807 provides that

> [a] statement not specifically cover ed by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is of fered than any other evidence which the proponent can pr ocure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

45

Fed. R. Evid. 807.

Ellwood argues that the District Court's admission of the Jonsson affidavit under Rule 807 was error , because Rule 807 is meant to be used only in the rare case, which, it argues, this is not. See United States v. Bailey, 581 F.2d 341, 347 (3d Cir. 1978) (stating that the r esidual hearsay exception is "to be used only rarely, and in exceptional circumstances," and is meant to "apply only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present").17 Specifically, Ellwood takes issue with the District Court's findings that the Jonsson affidavit was exceptionally trustworthy and that it was more probative than any other evidence that Uddeholm could present.

While Ellwood is correct that Rule 807 should only be used in rare situations, the District Court made careful and extensive findings in support of its conclusion that this was such a situation. See Tr. of Jury Trial, March 24, 1999. First, the District Court ascertained that the r equirements of Rule 807 were met. The court specifically found that

> – the affidavit was offered as evidence on a material fact, namely the parties' course of dealings, which bears upon the interpretation of the Agr eement;

> – the affidavit was more probative on the point for which it is offered than any other evidence which the proponent could procure thr ough reasonable efforts: it was highly probative because Jonsson was the only representative of Uddeholm on the EUS board of directors at the time in question, and, as

_____

17. Before 1997, the residual hearsay exceptions in the Federal Rules of Evidence were contained in Rules 803(24) and 804(b)(5). In 1997 the Rules were amended and these two residual exceptions were combined and transferred to the new Rule 807. "This was done to facilitate additions to Rules 803 and 804. No change in meaning is intended." Fed. R. Evid. 807 advisory committee's note. Bailey addressed the old residual hearsay exceptions contained in Rules 803(24) and 804(b)(5), but because Rule 807 is simply the combination of these rules, Bailey's holding applies to the current Rule 807 as well. The same is true of other pre-1997 cases on the residual hearsay exceptions that are cited in this Section.

such, this evidence was the only evidence that Uddeholm could present to counter the Ellwood's allegation that Uddeholm understood the Agreement to permit sales to third parties and r eimbursement for those sales;

– the general purpose of the rules, fair ness and the administration of justice, would be served by admitting the affidavit, because it would assist the jury in determining the truth;

– there was sufficient notice to Ellwood that it would be used, as Uddeholm proffered the affidavit months prior to trial, and there was argument and briefs filed on the issue.

The District Court found that the following factors also militated in favor of admitting the Jonsson affidavit:

– Ellwood had ways to rebut the affidavit: its witnesses were present at the meetings discussed therein, and these witnesses could present their testimony, while Uddeholm's only witness to these meetings (Jonsson) was dead;

– the affidavit was trustworthy because: (1) the declarant was known and named, (2) the statement was made under oath and penalty of perjury, (3) the declarant "was aware of the pending litigation at the time he made the declaration and thus knew that his assertions were subject to cross examination," (4) the statements were based on personal observation, (5) the declarant was not employed by the plaintiff at the time of the statements, and thus had no financial interest in the litigation's outcome, (6) the affidavit was corroborated, partially, by minutes of directors meetings (some statements Jonsson said were made match others' notations), and (7) his position and background qualified him to make the assertions.

The District Court then acknowledged that Rule 807 should only be used sparingly, but opined that this affidavit presented "a rather unique combination of circumstances where a material fact can be proved only through one

47

method, or, in this case, rebutted by only one method." The court was also swayed by the fact that it was Ellwood that first argued that Uddeholm knew of Ellwood's interpretation of the Agreement because Jonsson must have gained this knowledge at the directors meetings; the only way Uddeholm could rebut this claim was via Jonsson's affidavit, given that he was not available to testify.

These findings are sufficient for us to hold that the District Court did not abuse its discretion when it admitted the Jonsson affidavit under Rule 807. In Copperweld Steel Co. v. Demag–Mannesmann–Bohler, 578 F.2d 953 (3d Cir. 1978), this Court upheld a district court's admission of a similar item––a memorandum prepared by a lawyer of an executive who was later killed––on a weaker showing by the district court under the predecessor rule to Rule 807 (Rule 804(b)(5)). See id. at 964. We ther efore hold that the admission of the Jonsson affidavit was not err or.

## 2. The Rydstad redaction

Ellwood also contends that the court erred in r equiring the redaction of portions of a 1988 memorandum from Bertil Rydstad before admitting it into evidence, on the basis that the portions redacted were legal conclusions. Uddeholm appointed Rydstad in 1987 to work with Ellwood at EUS; in March 1988 Rydstad prepar ed a memo detailing his understanding of Uddeholm's and Ellwood's rights and obligations regarding EUS. The District Court admitted the memo into evidence but first required Ellwood to redact the following passage from the memo: "Thus, under the contracts there are only two purchasers. Nothing, however, precluded [sic] them from reselling to a third party." The District Court required this language to be redacted on the grounds that "it appears to be a legal interpretation by a non-legal person, and not even a person who was privy to the negotiations [on the Agreement], nor do we have any indication that that view was adopted or accepted by anybody else in the company in terms of their course of dealings." Tr. of Jury Trial, Apr. 1, 1999. The court also noted that the redacted statement did not expr ess any point of view on whether Ellwood should be able to get rebates for ingots sold to third parties, which is really what

48

the dispute over the interpretation of the Agreement was about.

Ellwood argues that the redacted language was essential to understanding Uddeholm's interpretation of the Agreement at the time, which would thereby affect the court's determination of whether the Agreement was ambiguous as well as the jury's interpretation of the Agreement. Under Pennsylvania law, a party's statements can be used to interpret a contract or to establish that party's understanding of the meaning of the contract. See City of Erie v. R.D. McAllister & Son. 204 A.2d 650, 660 (Pa. 1964); Z &L Lumber Co. of Atlasburg v. Nor dquist, 502 A.2d 697, 701 (Pa. Super. Ct. 1985). In our view, however, the District Court did not abuse its discretion in requiring the redaction. It appears from the evidence in the record that Rydstad was not trained in the law, nor was he involved in the contract negotiations; thus, Rydstad did not seem to possess the requisite expertise or backgr ound to draw the conclusion contained in the redacted passage. Furthermore, despite his role as the point man at Uddeholm for the EUS project, there is no evidence that R ydstad's views reflected those of Uddeholm or that anyone else at Uddeholm adopted them. Finally, because the redacted language did not address whether Ellwood could receive rebates on its third-party sales, the language does not speak to Uddeholm's understanding of the Agreement as to this issue, although it seems reasonable that the jury could have become confused about that if it had been given the memo without the redaction. Thus, it was within the court's discretion to require the redaction.

VIII. Conclusion

For the foregoing reasons, the Judgment of the District Court will be affirmed in part and vacated in part, and the case remanded to the District Court for pr oceedings consistent with this opinion. Parties to bear their own costs.

49

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit