

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-17-2004

# Williams v. Hilton Grp PLC

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2590

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Williams v. Hilton Grp PLC" (2004). *2004 Decisions.* Paper 928.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/928

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>**NOT PRECEDENTIAL**</u>

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-2590

———————

STUART A. WILLIAMS;
WSC INVESTMENTS, LLC, a
Pennsylvania Limited Liability Company,

Appellants

v.

HILTON GROUP PLC;
LADBROKES INTERNATIONAL BETTING AND GAMING;
a division of Hilton Group, PLC,
ALAN ROSS, an individual

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

(Dist. Court No.  99-cv-02024)
District Court Judge: Honorable Arthur J. Schwab

———————

Argued: January 13, 2004

Before: ALITO, CHERTOFF, and BECKER, <u>Circuit Judges</u>.

(Opinion Filed: March 17, 2004 )

———————

David L. McClenahan (argued)

Joseph Leibowicz
Lucas G. Paglia
Kirkpatrick & Lockhart
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA 15222

*Attorneys for Appellants*

Danforth Newcomb
John Gueli (argued)
Tammy P. Bieber
Shearman & Sterling
599 Lexington Avenue
New York, NY 10022

Paul H. Titus
Schnader, Harrison, Segal & Lewis
120 Fifth Avenue
Fifth Avenue Place, Suite 2700
Pittsburgh, PA 15222

Timothy K. Lewis
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006

*Attorneys for Appellees*

---

OPINION OF THE COURT

---

PER CURIAM:

Stuart A. Williams and WSC Investments, LLC (collectively "Williams") filed this

action against the Hilton Group, plc and Ladbrokes International Betting and Gaming, a division of the Hilton Group (collectively "Ladbrokes"), alleging breach of contract in connection with Williams's efforts to purchase various North American gaming assets owned by Ladbrokes. Williams subsequently amended his complaint, adding claims against Hilton for fraudulent and negligent misrepresentation and punitive damages and adding Alan Ross, the Managing Director of Ladbrokes, as a defendant on the tort claims. The case was originally assigned to Judge Donald J. Lee but was later reassigned to Judge Arthur J. Schwab, who granted summary judgment in favor of Ladbrokes on the tort claims asserted. This decision was based on Pennsylvania's "gist of the action" doctrine. The District Court certified its order for interlocutory appeal under 28 U.S.C. § 1292(b)(2), and a motion panel of our court permitted the appeal. Although neither the order of the District Court nor the application for review specified the precise question or questions presented for interlocutory review, see Fed. R. App. Proc. 5(b)(1)(B), the issues are sufficiently clear to permit the appeal to go forward. We hold that the "gist of the action" doctrine bars the tort claims at issue.

As a preliminary matter, we reject Williams's argument that the law-of- the-case doctrine precluded Judge Schwab from granting summary judgment for Ladbrokes on the tort claims. Williams contends that Judge Lee had previously held that the "gist of the action" doctrine did not apply to the claims at issue, but we disagree. Williams's papers cited some "gist of the action" cases and maintained that his contract and fraud claims

3

could coexist, see App. at 2373-74, 2380-82, but Judge Lee's opinion made no direct or indirect reference to the doctrine, and it was not necessary for Judge Lee to decide the issue in order to make the rulings that he did .

We also reject Williams's argument that the "gist of the action" doctrine does not bar his tort claims. Although the Pennsylvania Supreme Court has not expressly adopted this doctrine, we predict that the state supreme court would adopt the doctrine as set out in the Superior Court's cases.

In Etoll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. Ct. 2002), the Pennsylvania Superior Court, stated that the "gist of the action" doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims." Id. at 14. The Court then described the difference between contract and tort claims as follows: "Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." Id. (quoting Bash v. Bell Telephone Co., 601 A.2d 825, 829 (Pa. Super. Ct. 1992)). In Etoll the Court found that the "fraud at issue was not so tangential to the parties' relationship so as to make fraud the gist of the action." Etoll, 811 A.2d at 21. Rather, the court stated, the fraud claims were so "inextricably intertwined with the contract claims" that they were barred as a matter of law from being raised independently. Id. The Superior Court has applied the

4

"gist of the action" doctrine in other cases. See, e.g., Pittsburgh Construction Co. v. Griffith, 834 A.2d 572 (Pa. Super. Ct. 2003) (applying Etoll and stating that "courts are cautious about permitting tort recovery based on contractual breaches"); Pennsylvania Manufacturers Association Insurance Co. v. L.B. Smith, 831 A.2d 1178, 1181 (Pa. Super. Ct. 2003) ("The 'gist of the action' doctrine is designed to maintain the conceptual distinction between breach of contract and tort claims."); Freestone v. New England Log Homes, Inc., 819 A.2d 550 (Pa. Super. Ct. 2003); see also Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103-04 (3d Cir. 2001). From our examination of the Pennsylvania cases, we conclude that the "gist of the action" doctrine cannot be captured by any precisely worded test. Instead, the doctrine appears to call for a fact-intensive judgment as to the true nature of a claim.

In making the requisite inquiry here, a recent case from the United States District Court for the Eastern District of Pennsylvania is instructive. In Penn City Investments, Inc. v. Soltech, Inc., 2003 U.S. Dist. LEXIS 22321 (E.D. Pa. Nov. 25, 2003), the Court held that the doctrine barred a fraudulent inducement claim where the defendant-counter-claimant alleged that the counter-defendant had made pre-contract statements in order to induce it to enter into a contractual relationship. The Court held that the fraudulent inducement claim was barred because the "pre-contractual statements concerned specific duties that the parties later outlined in the contract." Id. at *12; see also id. at *15 (dismissing the tort claims because they were "directly addressed by the contract, or so

5

closely related to the contractual relationship, that the dispute between the parties [needed to be] resolved by exclusive reference to contractual principles").

Here, Williams contends that his fraud claims are not for fraud in the performance of a contract but are akin to claims for fraud in the inducement because Ladbrokes "induced Williams into signing the Letter of Intent and dealing with Ladbrokes by lying about its intent to honor the agreement." Appellants' Br. at 25. According to Williams, Ladbrokes and Ross engaged in a scheme by which they induced Williams to "commit to buying the properties for $120 million on an exclusive basis, while secretly marketing the properties to other buyers." Id. at 26. The Letter of Intent, they assert, was the device by which Williams was induced and deceived.

Applying the case law cited above, we conclude that Williams's tort claims are barred. Williams's tort claims are all founded on Ladbrokes' agreement to grant him the exclusive right to purchase the North American assets during the due diligence period. Williams and Ladbrokes are sophisticated parties who were well able to protect their rights in relation to this matter by contract, and they attempted to do so. On the particular facts presented here, we agree with the District Court that the "gist" of Williams's claims sounds in contract, not tort. Because of the nature of the "gist of the action" doctrine and because clarification of the doctrine for precedential purposes must come from the state courts, further explanation of our holding in this case would not be fruitful.

Finally, we hold that the District Court did not err in concluding that the doctrine

barred Williams's claims against Ross, as well as his claims against Ladbrokes. Although Williams did not have a contractual relationship with Ross, Williams cannot detach Ross from his status as an agent for Ladbrokes. Ross served as the principal negotiator for Ladbrokes. As the Pennsylvania courts have spelled out, the gist of the action doctrine bars tort claims against an individual defendant where the contract between the plaintiff and the officer's company created the duties that the individual allegedly breached. See Flynn Co. v. Peerless Door & Glass, Inc., 2002 WL 1018937, at *3 (Pa. Com. Pl. May 15, 2002) (stating that because it was the contract between the "plaintiff and defendants that created the duties which Pratt [the individual in question] allegedly breached" that the gist of the action doctrine barred a suit against the company's officer); Atchison Casting Corp. v. Deloitte & Touche, LLP, 2003 WL 1847665, at * 1 (Pa. Com. Pl. March 14, 2003) (dismissing tort claims against corporation and individual defendants who were employees of corporation on basis of the gist of the action doctrine); Flynn Co. v. Cytometrics, Inc., 2000 WL 33711055, at *4 (Pa. Com. Pl. Nov. 17, 2000) (dismissing misrepresentation claims against corporation and its employees individually under the gist of the action doctrine because the alleged misrepresentations were breaches of the exclusive representation agreement). All of Ross's alleged misrepresentations concerned matters governed by the Letter of Intent between Ladbrokes and Williams.

After reviewing, all of Williams's arguments, we affirm the District Court order granting summary judgment in favor of Ladbrokes on the tort claims at issue.

BECKER, *Circuit Judge*, dissenting.

I agree with the majority's disposition of the law of the case issue. However, I disagree with the majority's interpretation and application of the Pennsylvania "gist of the action" jurisprudence, hence this dissent from the judgment. I believe that the majority reads Pennsylvania law too narrowly. I also believe that its abbreviated and antiseptic rendering of the underlying facts belies the true nature and ultimate essence of Ladbrokes' conduct, which (if proven) would render it liable in tort. I begin with a fuller description of that conduct, from which it will be apparent that the written agreement, on which the majority focuses, is not the central fact of the case but rather a mere instrument of Ladbrokes' fraudulent scheme.

I.

In June 1999, plaintiff Stuart Williams was approached by Ladbrokes to solicit his interest as a potential buyer for Ladbrokes' North American gaming businesses. By July 1999, Williams and Alan Ross, representing Ladbrokes, had reached an oral understanding that Williams would purchase several of Ladbrokes' casinos, betting parlors and racetracks for $120 million cash. They then negotiated the terms of a binding letter of intent. When Ross first met Williams, he had not yet tested the market for the properties, but he did not want to preclude a deal with Williams if he was unable to get a higher price elsewhere. Williams insisted that he have the exclusive right to purchase the properties during the period of due diligence and final agreement drafting. Indeed

8

Williams told Ross that he would not spend "one minute" of his time or "one penny" of his money pursuing a transaction unless Ladbrokes intended to deal exclusively with him. Ross did not want exclusivity but, recognizing that Williams would not proceed further without it, he ultimately assured Williams that Ladbrokes would deal exclusively with him; the consideration was a hefty purchase price. Although the assurance of exclusivity was memorialized in the letter of intent and signed by Williams and Ladbrokes, it is clear from the record that Ladbrokes and Ross never intended to provide exclusivity to Williams.

The record is uncontradicted that Ladbrokes and Ross, even as they negotiated specifically with Williams about exclusivity and extracted additional consideration from him in exchange for it, secretly marketed the properties to others. When asked by Williams whether Ladbrokes had engaged or was engaging in such discussions, Ross lied and told Williams "no," and when asked in his deposition why he had not disclosed his contacts with other potential buyers to Williams, Ross answered, "Why would I?" An internal Ladbrokes memorandum written by Ross stated that he intended merely to "keep [Williams] in the running" while he shopped the properties to third parties.

Moreover, throughout August and September 1999, Ross repeatedly lied to Williams about Williams's access to due diligence materials, and about the solicitation of offers for the property under agreement with Williams. When Williams told Ross that he

was concerned about the continuing delays and excuses, and specifically asked Ross whether Ladbrokes was dealing with others, Ross told Williams, "You don't have anything to worry about," and "you're just overreacting." But, on July 28, 1999, the same day Ross signed the letter of intent, Ross had sent documents relating to some of the properties to one prospective purchaser and a confidentiality agreement to another. On August 3, Ross met another potential buyer and discussed the possible acquisition of the properties, including purchase price. And on August 5, Ross met and negotiated with two other prospective purchasers. Then, on August 10, Ross met with another interested party, who made an offer. Also that day, another Ladbrokes executive faxed financial statements and other financial information for the Pennsylvania properties to still another potential buyer.

On August 26, 1999, Ladbrokes issued a press release indicating an intent to sell its North American properties, including the businesses covered by the letter of intent. Strikingly, the press release made no mention of Williams or the letter of intent. In response, at least seven more individuals expressed their interest in purchasing some or all of the properties. By the end of August, Ross had sent financial information to another prospective purchaser and offered to meet with him the following week. Over the course of the next week, Ross continued to meet with other possible buyers and received a concrete offer from one of them.

Williams called Ross immediately after becoming aware of the August 26,

10

1999 press release. Ross told Williams that "the press release really didn't have anything to do with our transaction." Ross further told Williams "not to worry, that this transaction was absolutely [his]." Ross also reminded Williams that Ladbrokes' board had "approved the transaction." After further conversations, Ladbrokes' CEO Peter George wrote confirming that Ladbrokes would "not solicit expressions of interest," would not "negotiat[e] terms of sale and purchase" with any third parties, and would not give any third parties access to the data room during the period that Williams had access. And yet on September 3, 1999, at about the same time Ross and George were assuring Williams they had not and would not solicit expressions of interest of send financial or legal documents to anyone else, Ross wrote a memo to George stating that Ross intended to "keep [Williams] in the running" while he continued to shop the gaming business.

Throughout September 1999, "the beat went on." The short of it is that defendants' repeated lies and misrepresentations were made to string Williams along while Ladbrokes and Ross continued to shop the properties to third parties. As Judge Lee, who preceded Judge Schwab in the case, found in connection with his grant of summary judgment on the issue of the defendant's breach of their obligation to negotiate in good faith under the letter of intent, "Ross and other Ladbrokes' officers and employees aggressively shopped around the gaming interests as to which Williams had just been granted exclusivity rights." This conduct continued even after Ladbrokes finally gave Williams access to the due diligence materials on September 22, 1999. There were

11

further discussions between Ladbrokes and Williams which ultimately imploded when Ladbrokes purchased, at a heavy discount, $54 million in bonds that Williams had expected to assume.

## II.

I do not quarrel with the majority's general statement of the relevant Pennsylvania jurisprudence, i.e., that the "gist of the action" doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims," and that "[t]ort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals."   And see *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 103-04 (3d Cir. 2001) (alteration in original):

> [T]he important difference between contract and
> tort actions is that the latter lie from the breach
> of duties imposed as a matter of social policy
> while the former lie for the breach of duties
> imposed by mutual consensus
>
> *Redevelopment Auth. of Cambria Cty. v. International Ins.
> Co.*, 454 Pa. Super. 374, 685 A.2d 581, 590 (1996) (en banc)
> (quoting *Phico Ins. Co. v. Presbyterian Med. Servs. Corp.*,
> 444 Pa. Super. 221, 663 A.2d 753, 757 (1995)).  In other
> words, a claim should be limited to a contract claim when
> "the parties' obligations are defined by the terms of the
> contracts, and not by the larger social policies embodied in the
> law of torts." *Bash v. Bell Tel. Co.*, 411 Pa. Super. 347, 601
> A.2d 825, 830 (1992).

12

I do, however, disagree with what I see as a crabbed view of Pennsylvania's willingness to apply tort principles where the facts show that a party to an alleged contract had a fraudulent intent with respect to its contractual promises. As I read the Pennsylvania cases, where, as here, there was fraudulent intent, i.e. a subjective and undisclosed intent not to perform, a fraud claim is stated.

Let me begin with basic principles. If a party to a contract misrepresents his or her present intention to perform, he or she has committed the tort of misrepresentation. On the other hand, if a party had a present intention to perform but later fails to perform, deliberately or otherwise, the action ordinarily is one for breach of contract, unless the breaching party gives knowingly false assurances of performance, in which case an action for misrepresentation can also lie. *See* 5 *Corbin on Contracts* § 1077 at 238 (Supp. Fall 2001) ("If a party attempts to commit fraud, he should not be insulated from liability for punitive damages, just because the means he has chosen for achieving his fraud happen to involve a breach of contract."). As we held in *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments*, 951 F.2d 1399, 1410 (3d Cir. 1991), under Pennsylvania law, "'[a] statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of fact.'" (quoting *Brentwater Homes, Inc. v. Weibley*, 369 A.2d 1172, 1175 (Pa. 1977)) (alteration in original).

My view of the open texture of Pennsylvania law in this area is supported by *Jahanshahi v. Centura Development Co.* 816 A.2d 1179 (Pa. Super. 2003), which

13

applied an analogous misfeasance/nonfeasance analysis. It is also supported by a number of federal district court cases applying Pennsylvania law. *See, e.g.*, *Precision Printing Co. v. Unisource Worldwide, Inc.,* 993 F. Supp. 338, 356 (W.D. Pa. 1998) ("[A] promise which the promisor had no intention of keeping at the time he made it may be actionable as fraud."); *Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp.*, 974 F. Supp. 822, 843 (E.D. Pa. 1997) ("'[A] cause of action for fraud can be predicated on future promises if the defendant knew at the time he made the promise that he would not carry it out.'" (quoting *Killian v. McCulloch*, 850 F. Supp. 1239, 1255 (E.D. Pa., 1994)); *Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599, 609 (M.D. Pa. 1994) (holding there was sufficient evidence for a jury to conclude that the defendant did not intend to perform when the promise was made); *Ebeling & Reuss, Ltd. v. Swarovski, Int'l*, 1992 WL 211554 *9 (E.D. Pa. August 25, 1992) ("[A] party can be liable for fraud if the party intended not to comply with the terms of the contract at the inception of the contractual relationship.").

I read the majority opinion as having twin foci. On the one hand, whenever fraudulent misrepresentations to induce a contract result in specific duties outlined in the later contract between sophisticated parties, the majority would bar an action in tort. On the other hand, candidly acknowledging the opaqueness and fluidity of the Pennsylvania gist of the action jurisprudence, the majority really seems to be making an impressionistic judgment as to whether the action sounds in contract or tort. I'll take it either way. The first focus, I respectfully suggest, is simply wrong as a matter of the history of the gist of

14

the action doctrine. The second, which seems to supply the majority's ratio decidendi, does not, I submit, square with the facts.

History tells us that sophisticated parties can be duped, especially when, like the late Tug McGraw, they want to believe. The faithless Ross was a master duper. As Judge Lee held, the facts support the conclusion:

> That Alan Ross and Ladbrokes deliberately and intentionally deceived plaintiffs and strung them along while shopping their business and properties around to third parties, knowing that plaintiffs would be incurring significant expenses toward due diligence on a deal defendants decided they were not going to consummate.

And as Judge Lee recognized, presented with the facts I have chronicled, a reasonable jury certainly could conclude that Ladbrokes, through Ross, entered into the letter of intent in order to induce Williams to keep his money on the table, with no present intention of honoring its contractual obligations.

The evidence here is overwhelming and uncontradicted. It reflects an egregious fraud, papered over by a contract. It is also a case in which "the parties' obligations are defined . . . by the larger social policies embodied in the law of torts." *Bohler-Uddeholm America, Inc., supra.* I believe that Pennsylvania would, on these facts, recognize a tort claim. I would therefore reverse the grant of summary judgment in favor of Ladbrokes (and, *a fortiori*, of Ross) and remand for a trial on Williams' fraud claim.

15