**MBIA INSURANCE CORP. and Wells Fargo Bank, N.A., as Trustee of Certain SFC Grantor and Owner Trusts, Plaintiffs,**

v.

**ROYAL INDEMNITY COMPANY, Defendant.**

**Royal Indemnity Company, Counterclaim Plaintiff,**

v.

**Wells Fargo Bank, N.A., as Trustee of Certain SFC Grantor and Owner Trusts, Counterclaim Defendant.**

**Civil Action No. 02–1294–JJF.**

United States District Court, D. Delaware.

Oct. 25, 2007.

---

Ronald S. Rauchberg, Esquire; Steven E. Obus, Esquire; Andre G. Castaybert, Esquire; Lisa A. Bauer, Esquire; Brian L. Friedman, Esquire and Erin Durba, Esquire of Proskauer Rose LLP, New York City, David C. McBride, Esquire; Melanie K. Sharp, Esquire; Dawn M. Jones, Esquire and Kristen Salvatore De-Palma, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Plaintiff and Counterclaim Defendant, Wells Fargo Bank, N.A.

Michael H. Barr, Esquire; Kenneth J. Pfaehler, Esquire and Lisa A. MacVittie, Esquire of Sonnenschein Nath & Rosenthal LLP, New York City, Philip Trainer, Jr., Esquire; Tiffany Geyer Lydon, Esquire and Andrew D. Cordo, Esquire of Ashby & Geddes, Wilmington, DE, for Defendant and Counterclaim Plaintiff, Royal Indemnity Company.

*MEMORANDUM OPINION*

JOSEPH J. FARNAN, District Judge.

Pending before the Court is Wells Fargo Bank N.A.'s Motion For Summary Judgment Dismissing Royal Indemnity Company's Amended Counterclaim (D.I.475). Royal Indemnity Company has responded to the Motion with a Cross–Motion For Summary Judgment On Its Amended Counterclaim (D.I.511) and a Combined Opening and Answering Brief. (D.I.512.) For the reasons discussed, the Court will grant Wells Fargo Bank N.A.'s Motion For Summary Judgment Dismissing Royal Indemnity Company's Amended Counterclaim and deny Royal Indemnity Company's Cross–Motion For Summary Judgment On Its Amended Counterclaim.

## BACKGROUND

### I. Procedural Background

This action was initially brought by Plaintiffs Wells Fargo N.A. ("Wells Fargo") and MBIA Insurance Corporation ("MBIA") to enforce unconditional guarantees in certain insurance policies issued by Royal Indemnity Company ("Royal"). Royal filed a Counterclaim alleging, among other things, breach of contract by Wells Fargo. The initial action brought by Wells Fargo has since been settled and the sole issue remaining before the Court is Count III of Royal's Amended Counterclaim alleging breach of contract against Wells Fargo.

### II. Factual Background

This action arises in connection with the student loan fraud scheme by Student Finance Corporation ("SFC") and its owner, Andrew Yao. SFC underwrote loans to students using funds borrowed from PNC Bank and Wilmington Trust Company. The student loans were insured by insurance policies issued by Royal that uncondi-

tionally guaranteed the students' repayment of principal plus 90 days interest. (Wells Fargo Appendix ("WF App.") at Ex. 6.)

SFC would then securitize large groups of insured student loans by conveying them to eight different trusts. Wells Fargo acted as the Trustee for each of the trusts. The trusts would, in turn, sell fixed income notes, called "Certificates," to investors. When the students repaid their loans to the trusts, the trusts could redeem the Certificates. The student loans were to be serviced by a servicing company affiliated with SFC, called Student Loan Servicing LLC ("SLS"). SFC and SLS were controlled by Yao.

When the student loans were securitized and conveyed to the trusts, Royal would issue new insurance policies insuring the same loans for the benefit of Wells Fargo, as the Trustee. (*Id.*) In each securitization, Wells Fargo entered into a Pooling and Servicing Agreement ("PSA") that specified its duties. (*Id.* at Ex. 26(PSA).) Royal was not a party to the PSAs but claims third party beneficiary status.

MBIA guaranteed payments of the Certificates issued by the trusts. If Royal failed to honor its policies, MBIA was required to supply funds to pay the Certificateholders. Royal earned over $35 million in premiums for insuring SFC loans. (*Id.* at Ex. 102 at No. 41.)

According to Royal's Amended Counterclaim, SFC systematically made payments on delinquent and defaulting loans to make it seem that the loans were performing. SFC referred to these payments as "forbearance payments." (*Id.* Ex. 83 at ¶ 60–62.) With one exception on August 19, 2001, SFC made the forbearance payments in large wire transfers to the collection accounts on one day in the last week of each month. Between January 2001 and

March 2002, SFC made over $50 million worth of these payments.

Pursuant to the terms of the PSAs, SLS acted as Servicer on each of the loans. SLS was required to deal with student debtors, send them statements and demand payment from them if necessary. SLS was to open lock box accounts, instruct students to make payments on the accounts, and once a month, transmit the collected funds to collection accounts at Wells Fargo Bank. (PSA §§ 3.2, 3.3, 3.5.) SLS provided a monthly Servicer Report to various parties, including Royal and Wells Fargo, that included the payment, account balance, delinquency and default information as requested by the parties to the transactions. (*Id.* at § 3.8(a).) Royal had the right to decide whether to renew or terminate SLS as Servicer every 60 days during the life of each transaction, and servicer renewal notices were circulated every 60 days for nearly two years, until SLS was terminated as Servicer in 2002. (WF App. at Ex. 79; Ex. 74.)

The PSAs also provided for an Independent Accountant to review the records and procedures of the Servicer and audit the Servicer Reports. The Independent Accountant was required to certify, among other things, that "nothing has come to the Independent Accountant's attention to indicate that . . . the information contained in such Servicer Reports . . . does not reconcile with the information contained in the accounts and records . . ." of the Servicer. (PSA § 3.16.) McGladrey & Pullen served as the Independent Accountant under the PSAs and issued a series of reports on the first four transactions in April 2001, certifying that McGladrey had compared the Servicer Reports with data maintained by SLS, including schedules of delinquent and defaulted student loans, and concluded that the amounts were in agreement, except for a few minor issues

that were subsequently resolved. (WF App. at Ex. 54.) Both Wells Fargo and Royal received these reports. (*Id.* at Ex. 99 at No.1.)

As Trustee, Wells Fargo had several duties under the PSAs. Royal's Amended Counterclaim centers on those duties provided for in Section 8.19 and 8.21 of the PSAs. In relevant part, the provisions provide:

> **Section 8.19 *Monitoring Duties of Trustee.*** The Servicer shall provide monthly to the Trustee information and data via electronic transmission as required by the Trustee, including without limitation, the items described below. The Trustee, so long as it is not a Successor Servicer, shall:
>
> (a) in accordance with *Section 3.8(b)* hereof, not later than 12:00 noon Minneapolis time on the second Business Day preceding each Servicer Report Date, accept delivery of the Tape used to calculate the information contained in the Servicer Report and shall accept delivery from the Servicer of a hard copy of the Servicer Report;
>
> (b) compare the information received on Tape from the Servicer to the same received on the Servicer Report with respect to delinquencies, ratios and the aggregate principal balance of the Student Loans;
>
> (c) review each Servicer Report issued by the Servicer pursuant to this Agreement, solely in respect of the mathematical accuracy thereof;
>
> (d) inform the Insurer, MBIA, the Servicer, and the Certificateholders as to any discrepancy on such Servicer Report if the Servicer has not resolved such discrepancy within 15 days after notice thereof from the Trustee;
>
> (e) prior to each Distribution Date, review the monthly Servicer Report related thereto and:

(i) determine that such monthly Servicer Report is complete on its face;

(ii) review the amounts on deposit in the Collection Account against the monthly distribution amounts set forth in such monthly Servicer Report and reasonably determine whether the amount on deposit is sufficient to pay such distribution amounts; and

(iii) determine the amount on deposit in the Liquidity Reserve Account; and

(f) no later than each Distribution Date, load the computer tape or diskette received from the Servicer pursuant to Section 3.8 hereof, confirm that such computer tape or diskette is in readable form, and calculate and confirm the aggregate Senior Certificateholder Balance and Interest–Only Notional Balance as of the most recent Record Date.

\* \* \*

### Section 8.21. *Servicer Monitoring Duties of the Trustee.*

(a) The Trustee, so long as it is not a Successor Servicer, will perform the services set forth in this *Section 8.21* which shall not be delegated to the Servicer, but may be assigned to a subcontractor of Trustee as provided in *Section 3.1* hereof. The Trustee shall, unless it is prohibited as a matter of law, as evidenced by an opinion of counsel, and unless a different Successor Servicer is appointed by the Insurer or MBIA, as applicable, service the Student Loans upon receipt of a Servicer Termination Notice under this Agreement or upon termination of the Servicer pursuant to *Section 3.2* hereof. The Trustee will, on a periodic basis, perform the functions specified in this *Section 8.21*, provided that the Trustee shall be entitled to request of and receive from the Servicer, all information necessary to conduct tests or make reports in a timely manner as specified below and, except as otherwise specified herein, the Trustee shall be entitled to assume for all purposes that the information received by it is true, correct and complete and the Trustee shall be fully protected in relying upon such information without any independent investigation or audit to prove the facts stated therein.

(b) Other than as specifically set forth elsewhere in this Agreement, the Trustee shall have no obligation to supervise, verify, monitor or administer the performance of the Servicer and shall have no liability for any action taken or omitted by the Servicer.

(c) The Trustee shall consult fully with the Servicer as may be necessary from time to time to perform or carry out the Trustee's obligations hereunder, including the obligation, if requested by the Insurer or MBIA, as applicable, to succeed at any time to the duties and obligations of the Servicer as servicer under *Section 3.2* hereof.

(d) The Trustee shall receive an electronic transmission of all servicing and/or Student Loan File information (including all relevant Obligor contact information, such as address and telephone numbers, as well as Student Loan principal balance and payment information, including any comment histories and collection notes) and shall review such Student Loan File information to ensure that it is in readable form and verify that the data balances conform to the trial balance reports received from the Servicer. In addition, the Trustee shall store such Student Loan File information and verify certain information contained in each Servicer Report. The Trustee shall receive the date referenced in this paragraph on a weekly

basis; *provided* that, at the request of MBIA, the Trustee shall receive, and the Servicer shall provide, any such servicing and/or Student Loan File information from the Servicer on a more frequent basis, up to and including daily transmissions.

(PSA §§ 8.19, 8.21, underlining in original.)

In connection with its duties under Section 8.19, Wells Fargo electronically received from the Servicer, for each SFC securitization, two Microsoft Excel spreadsheets. The first spreadsheet was entitled "Delinquency Aging Report" and contained loan-level data on current and delinquent loans, including names, social security numbers, outstanding balances and delinquency status. The second spreadsheet was entitled "Default Schedule" and contained similar information on loans that had defaulted during the month. Wells Fargo compared the delinquency and default information summarized in the monthly Servicer Report with the delinquency and default information contained in the two spreadsheets. (WF App. at Ex. 1; Ex. 93 at 33–34; Ex. 34–35; Ex. 68–69.)

Royal does not dispute that Wells Fargo performed this monthly comparison, but contends that Wells Fargo should have been comparing weekly computerized tape updates with the Servicer Reports. Royal alleges that had this comparison been made, Wells Fargo would have discovered the SFC "forbearance payments" and Royal would not have engaged in future transactions with SFC resulting in the issuance of additional insurance policies.

### STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there are triable issues of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of his case for which he bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Id.* at 322, 106 S.Ct. 2548. Moreover, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### DISCUSSION

**I. Whether Wells Fargo Is Entitled To Summary Judgment On Royal's Amended Counterclaim That Wells Fargo Breached Section 8.19 Of The PSAs**

The parties' arguments concerning Wells Fargo's alleged breach of Section

8.19 of the PSAs centers, in the first instance, on the meaning of the terms "tapes," as used in that section. Both Royal and Wells Fargo contend that the term is unambiguous, and therefore, may be interpreted by the Court as a matter of law.

Royal contends that the term "tapes" is expressly defined to include weekly computer tapes in Section 1.1 of the PSAs, which in turn references a more precise definition set forth in Section 3.8(b)[1] of the PSAs. Royal further contends that Sections 8.19 and 6.17 of the PSAs are the only sections which require Wells Fargo or anyone else to take any action with respect to the tapes, and therefore, the Section 3.8 definition must have been meant to apply to Sections 8.19 and 6.17.[2] Royal also contends that Section 8.19(b) does not reference back or incorporate Section 8.19(a), and therefore, Section 8.19(a) cannot be used to alter the meaning of the defined term "tapes."

Wells Fargo contends that the term "tapes" is clearly defined by the context of Section 8.19 to refer to only monthly tapes and not weekly tapes. Wells Fargo points out that Section 1.1 of the PSAs defines certain phrases "unless the context otherwise requires." Wells Fargo contends that the context of Section 8.19 "otherwise requires" the term "tapes" to be construed as monthly tapes. Wells Fargo further points out that Section 8.19 refers to the "Tape used to calculate the information contained in the Servicer Report." Since the Servicer Report is a monthly report, Wells Fargo contends that the tape referred to in Section 8.19 must also be the monthly tape.

The parties agree that the duties of the Trustee under the PSAs are governed by Minnesota law and federal law. All other rights, obligations and remedies under the PSAs are governed by Pennsylvania law. Both parties also agree that there is no significant difference between Minnesota and Pennsylvania substantive law, and therefore, the Court finds cases from both jurisdictions to be instructive.

▆▆▆ The paramount goal of contract interpretation is to effectuate the intent of the parties. *Morningstar v. Hallett*, 858 A.2d 125, 129 (Pa.Super.2004). The words of a contract are considered the best indicia of the parties' intent. *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 92 (3d Cir.2001) (citing *Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638, 642 (1993)). The terms of a contract are construed consistently with their plain and ordinary meaning. *Knudsen v. Transport Leasing/Contract, Inc.*, 672 N.W.2d 221, 223 (Minn.App.2003). The construction of a contract is a question of law, unless there is an ambiguity. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn.1979).

---

1. Section 3.8(b) provides:

   (b) *Weekly Computer Tape Update.* The Servicer shall deliver to the Trustee on or prior to 12:00 noon Minneapolis time on each Weekly Report Date and on each Servicer Report Date an update of the computer tape, diskette or other computer readable medium, in a format acceptable to the Trustee which provides information as to the Student Loans reflecting the information set forth thereon as of the preceding Servicer Report Date (the "tape"), together with any information with respect to the changes in the computer software programs used to generate the computer tape, diskette or other medium, as the case may be, necessary to render such computer tape readily usable by a Successor Servicer. The Servicer shall provide the Trustee with a hard copy of the Servicer Report on each Servicer Report Date.

2. Royal does not assert a breach of Section 6.17 of the PSAs.

■ Because the contract is presumed to convey the parties' intent, it will only be considered ambiguous if " 'it is reasonable or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.' " *Bohler–Uddeholm,* 247 F.3d at 93 (citations omitted); *Holm v. Quinn,* 2004 WL 887190 (Minn.App.2004). A contract is not ambiguous if its meaning can be determined "without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Bohler–Uddeholm,* 247 F.3d at 93. Extrinsic evidence is generally not considered in determining whether an ambiguity exists. *In re Hennepin County 1986 Recycling Bond Litigation,* 540 N.W.2d 494, 498 (Minn.1995). Rather, the determination of whether an ambiguity exists in the first instance is guided by " 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.' " *Bohler–Uddeholm,* 247 F.3d at 93 (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980)). Moreover, the mere fact that the parties disagree on the proper construction of a contract is insufficient to render the contract ambiguous. *Id.* Whether an ambiguity exists is a question of law. *Blattner v. Forster,* 322 N.W.2d 319, 321 (Minn.1982).

■ Applying these principles to the PSAs, the Court concludes that the meaning of the term "tape," as used in Section 8.19 and in the context of the PSAs as a whole, is not ambiguous. Section 8.19 begins with the obligation of the Servicer to provide certain data to the Trustee on a monthly basis. That data and its delivery time is then described more fully in Section 8.19(a) as including "the Tape *used to calculate the information contained in the Servicer Report."* (PSA § 8.19(a).) It is undisputed that the Servicer Report is a monthly report. Moreover, Section 8.19(b) then requires the Trustee to "compare the information received on Tape from the Servicer to *the same* received on the Servicer Report with respect to delinquencies, ratios and the aggregate principal balance of the student loans." (*Id.*) (emphasis added.) Thus, the Court concludes that the "tape" to be accepted by the Trustee each month under Section 8.19(a) and used in the comparison required by Section 8.19(b) was a monthly tape.

Royal contends that the term "tape" must be defined consistently with the definitions provided in the PSAs, and therefore, it must include the weekly tapes. Section 1.1 lists the term "tape" as a defined term and references Section 3.8(b) as providing the definition for the term; however, Section 1.1 expressly states that the defined words are only given the meaning ascribed in Section 1.1, "unless the context otherwise requires." The context of Section 8.19 is clear that the comparison contemplated was a monthly comparison between monthly tapes used to calculate the information contained in the Servicer report and the monthly Servicer Reports, and therefore, the Court is not persuaded by Royal's argument.

■ In the alternative, Royal contends that, even if the term tapes refers to monthly tapes, Wells Fargo should have discovered the one-day, no principal payments from SFC. As Wells Fargo points out, however, the Servicer Reports to which the monthly tapes were compared did not contain line items showing the dates the payments were received or how the payments were allocated to principal or interest. The Servicer Report also did not show who submitted the payments. Thus, Wells Fargo could not have com-

pared the information Royal contends was evident and/or important on the monthly tapes "to the same" on the Servicer Report, because the Servicer Report did not contains such information. Moreover, the information Royal highlights was not relevant to the comparison Wells Fargo was required to make under the express language of Section 8.19, which was a comparison of "the information received on Tape from the Servicer *to the same* received on the Servicer *with respect to delinquencies, ratios and the aggregate principal balance of the Student Loans,*" and Royal has not identified any discrepancies between the monthly tapes and the items required to be compared under Section 8.19. (PSA § 8.19, emphasis added.) In addition, the discrepancies required to be reported to the Insurer, MBIA and the Certificateholders under Section 8.19(d) were "discrepancies on such Servicer Report." Royal does not explain how the information it highlights on the monthly tapes created a "discrepancy" on the Servicer Report that would have required reporting under the PSAs. Accordingly, the Court concludes that Wells Fargo is entitled to summary judgment on Royal's breach of contract Counterclaim under Section 8.19 of the PSAs.

## II. Whether Wells Fargo Is Entitled To Summary Judgment On Royal's Amended Counterclaim That Wells Fargo Breached Section 8.21 of the PSAs

Royal also asserts in its Amended Counterclaim a third-party beneficiary breach of contract claim against Wells Fargo on the basis of Section 8.21 of the PSAs. Royal contends that its third-party beneficiary status is created under Section 11.9 of the PSAs and is not limited to any specific provisions of the PSAs. Royal also contends that Wells Fargo failed to per-

form the balancing and verification duties required by Section 8.21.

Although Wells Fargo did not dispute Royal's third party beneficiary status under Section 8.19 of the PSAs, Well Fargo contends that Royal is not a third party beneficiary of Section 8.21. Specifically, Wells Fargo contends that Section 8.20 of the PSAs limits the third party beneficiaries of Section 8.21 to the Certificateholders. Wells Fargo also contends that under Section 8.20, Wells Fargo had no liability for its Section 8.21 monitoring duties.

To have standing to recover on a contract as a third party beneficiary, the contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must affirmatively appear in the contract. *Scarpitti v. Weborg,* 530 Pa. 366, 609 A.2d 147, 149 (1992). A party can be a beneficiary of some promises in a contract and not of others. *See e.g., Warner v. U.S. Secs. & Futures Corp.,* 257 A.D.2d 545, 685 N.Y.S.2d 25, 26 (N.Y.A.D. 1st Dep't.1999) (holding that third party beneficiary of an agreement could not enforce the arbitration provision, because it was "not obvious" that the agreement intended to make the third party a beneficiary of that provision); *Northwest Airlines, Inc. v. Crosetti Bros., Inc.,* 258 Or. 340, 483 P.2d 70, 72 (1971) ("A contract may consist of a series of promises ... Third parties may be beneficiaries of some of these promises and not of others ..."). Two tests are used to determine whether a party is a third party beneficiary, the intent-to-benefit test, and the duty owed test. *Eischen Cabinet v. New Tradition Homes, Inc.,* 2006 WL 3593051 (Minn.App. Dec. 12, 2006). In this case, the applicable test is the intent-to benefit test.

The intent to benefit test is satisfied when the circumstances indicate that the promisee intends to give the bene-

ficiary the benefit of the promised performance. *See e.g., Scarpitti,* 609 A.2d at 149–150. These circumstances include whether the contract expresses some intent by the parties to benefit a third party and whether performance is to be rendered directly to a third party. *Eischen Cabinet,* 2006 WL 3593051 at \*4. The party asserting third party beneficiary status bears the burden of demonstrating that the contract, or a provision thereof, was made for its benefit. 13 *Williston on Contracts* § 37:8.

■ In this case, Section 11.9 of the PSAs provides the starting point for the third party beneficiary analysis. Specifically, Section 11.9 provides:

> **Section 11.9** *Third Party Beneficiaries.* Except as otherwise specifically provided herein with respect to the Certificateholders, the parties to this Agreement hereby manifest their intent that no third party other than each Certificateholders, the Insurer and MBIA shall be deemed a third party beneficiary of this Agreement, and specifically that the Obligors are not third party beneficiaries of this Agreement.

(PSA § 11.9.) Thus, the Insurer, in this case Royal, is an intended beneficiary of the PSAs *"except as otherwise specifically provided herein with respect to the Certificateholders."* (*Id.,* emphasis added.) The Court concludes that the limitations set forth in Section 8.20 of the PSAs fit this proviso. In this regard, Section 8.20 provides that "[t]he Trustee, so long a it is not a Successor Servicer, shall monitor the performance of the Servicer *on behalf of the Certificateholders* ..." (PSA § 8.20, emphasis added.) Thus, Section 8.20 expressly carves out the Certificateholders as the beneficiaries of the duties described in Section 8.21. Stated another way, the Court concludes that Section 8.20 limits the third party beneficiaries of Section 8.21

to the Certificateholders. Because the third party beneficiaries defined in Section 11.9 of the PSAs are limited with regard to Section 8.21 by the express terms of Section 8.20, the Court concludes that Royal lacks standing to assert a breach of Section 8.21, as a third party beneficiary.

In the alternative, however, even if Royal is considered a third party beneficiary of Section 8.21, the Court concludes that Wells Fargo has no liability for breach of its duties under that Section. In this regard, Section 8.20 also provides that "the Trustee shall not have any liability in connection with the malfeasance or nonfeasance by the Servicer *or for monitoring the Servicer."* (*Id.,* emphasis added.) Royal directs the Court to Section 8.5 of the PSAs for the proposition that *"no provision of the contract* shall relieve the Trustee of its duties to perform the obligations it has undertaken in the PSAs." (D.I. 512 at 13.) However, the language of Section 8.5 is not as sweeping as Royal suggests. Specifically, Section 8.5 lays out a variety of duties for which the Trustee has no liability, and then goes on to state: "provided, however, that *none of the foregoing* shall relieve the Trustee of its obligation to perform its duties under this Agreement." (PSA § 8.5, emphasis added.) Stated another way, the caveats in Section 8.5 may not limit the Trustee's liability to perform its other duties under the PSAs, but that does not mean that the Trustee's liability cannot be limited by other provisions of the contract. In this case, Section 8.20 limits the Trustee's liability with respect to its Section 8.21 duties, and there is nothing in Section 8.5 which precludes the limitation of liability through another provision of the PSAs. Because Section 8.20 disclaims any liability on the part of the Trustee for its Section 8.21 duties, the Court concludes that Wells Fargo is entitled to judgment as a matter

of law on Royal's Amended Counterclaim asserting breach of contract under Section 8.21 of the PSAs.

## CONCLUSION

In sum, the Court concludes, as a matter of law, that Royal cannot succeed on its breach of contract Counterclaims. Accordingly, for the reasons discussed, the Court will grant Wells' Fargo's Motion For Summary Judgment and deny Royal's Cross–Motion For Summary Judgment.

An appropriate Order will be entered.

## *ORDER*

At Wilmington, this 25th day of October 2007, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Wells Fargo Bank N.A.'s Motion For Summary Judgment Dismissing Royal Indemnity Company's Amended Counterclaim (D.I 475) is *GRANTED.*

2. Royal Indemnity Company's Cross–Motion For Summary Judgment On Its Amended Counterclaim (D.I.511) is *DENIED.*